Jack **LEFRANCOIS** d/b/a Blackstone Valley Disposal

v.

**STATE OF RHODE ISLAND** and Rhode Island Solid Waste Management Corporation.

Civ. A. No. 87-361 P.

United States District Court, D. Rhode Island.

Sept. 15, 1987.

Howard Croll, Stephen Izzi, Fontaine & Croll, Ltd., Woonsocket, R.I., for plaintiff.

Gary Powers, David Prior, Rhode Island Atty. Gen's. Office, Albert West, Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This case presents the question of whether a state may prohibit the disposal of out-of-state waste at a state-subsidized sanitary landfill where no privately owned landfill provides an alternative disposal site for out-of-state waste. Specifically at issue in this case is the constitutional validity of section 23–19–13.1 of the Rhode Island General laws, which imposes criminal sanctions upon any individual found dumping out-of-state waste at the state-subsidized Central Landfill in Johnston, Rhode Island, the sole Rhode Island disposal site for all categories of non-hazardous solid waste. The plaintiff in this action, a commercial handler of solid waste, challenges this statutory provision on the grounds that it violates the Commerce Contract, and Privileges and Immunities Clauses of the Constitution of the United States.

## I. FACTUAL BACKGROUND

The plaintiff, Jack Lefrancois, doing business as Blackstone Valley Disposal ("Blackstone"), is a commercial hauler of refuse, trash and other solid waste. Mr. Lefrancois is a resident of Blackstone, Massachusetts. Blackstone's principal places of business are Blackstone, and Millville, Massachusetts. Blackstone Valley Disposal operates its refuse-hauling business in the Rhode Island-Massachusetts border area around Blackstone, Massachusetts. Blackstone routinely collects waste from both Rhode Island and Massachusetts sources; approximately 20% to 30% of Blackstone's gross revenues derive from its waste-collection activities in Rhode Island.

The defendant, the Rhode Island Solid Waste Management Corporation ("RISWMC") is a legislatively-created public agency formed in 1974 in order to plan, construct, operate and maintain a statewide system of solid waste management facilities and services. Since December 1980, the Solid Waste Management Corporation has owned and operated the Central Landfill in Johnston, Rhode Island; RISWMC purchased the Central Landfill from a private owner-operator. The Central Landfill is currently the largest sanitary landfill in New England and the only sanitary landfill in Rhode Island that accepts all categories of non-hazardous waste. The last privately-owned landfills in Rhode Island closed in 1985 after reaching capacity, although four license applications for private landfills and two applications for resource recovery facilities are currently pending before the Rhode Island Department of Environmental Management.

The Rhode Island Solid Waste Management Corporation purchased the Central Landfill with funds raised through the issuance of tax-exempt bonds. In addition to authorizing the sale of the bonds, the State of Rhode Island has subsidized the RISWMC when tipping fees at the Central Landfill have not covered operating costs. Beginning with the fiscal year ending June 30, 1982, the State of Rhode Island has subsidized RISWMC as follows:

| | |
|---|---|
| 1982: | $339,869 |
| 1983: | $ 75,000 |
| 1984: | $200,000 |
| 1985: | $200,000 |

In addition, the Solid Waste Management Corporation owes an outstanding loan to the State of Rhode Island in the amount of $534,000.

On or about September 29, 1986, RISWMC and Blackstone entered into an agreement ("the Agreement") which allowed Blackstone to dispose of its collections at the Central Landfill without regard to the geographic source of the waste, so long as the amount of Massachusetts waste deposited at the landfill did not exceed the amount of Rhode Island waste deposited in Massachusetts. Pursuant to this agreement, Blackstone dumped an average of four hundred tons of solid waste per month at the Central Landfill, enabling Blackstone to maintain a profitable business.

On or about June 29, 1987, the State of Rhode Island enacted legislation entitled: "An Act Relating to the Central Landfill." This act amended Title 23, Chapter 19 of the Rhode Island Gneral Laws (the chapter relating to the solid waste Management Corporation), and in the provision relevant to this controversy, prohibited the disposal of out-of-state waste at the Central Landfill. The amendment states:

(a) No person, firm, or corporation engaged in the business of collecting and disposing of solid waste shall deposit solid waste that is generated or collected outside the territorial limits of this state at the central landfill. Each deposit in violation of the provisions of this subsection shall be punishable by imprisonment for up to three (3) years and/or a fine not to exceed five thousand dollars ($5000).

R.I.Gen.Laws section 23–19–13.1 (1987). By letter dated July 1, 1987, the Solid Waste Management Corporation notified Blackstone of the Rhode Island legislature's action and informed the company that RISWMC would refuse to accept any out-of-state waste at the Central Landfill, including the "border waste" that was the subject of the parties' earlier agreement.

On July 2, 1987, the plaintiff filed a Motion for a Temporary Restraining Order seeking to restrain the defendants from enforcing the provisions of the Act or instituting proceedings to enforce the Act against the plaintiff pending adjudication of the constitutionality of the statutory amendment. After a hearing on the motion, this Court denied the plaintiff's request for a Temporary Restraining Order. The parties agreed to enter a statement of stipulated facts; this matter is now before the Court on cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As there are no material facts in dispute, I may determine which party is entitled to judgment as a matter of law.

## II. THE COMMERCE CLAUSE

### A.

The Commerce Clause of the United State Constitution provides that "[t]he Congress shall have power ... to regulate Commerce with foreign Nations, and among the several states, and with the Indian tribes ...." U.S. Const. Art. I, section 8. Although "phrased as an affirmative grant of power to Congress," L. Tribe, *American Constitutional Law* section 6–2 at 320 (1978), the United States Supreme Court has subjected the Commerce Clause to a dual interpretation: "The Commerce Clause has ... been interpreted ... not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979) (footnote omitted). This latter interpretation, often referred to as the "dormant" Commerce Clause, *see, e.g., White v. Massachusetts Council of Construction Employers*, 460 U.S. 204, 213, 103 S.Ct. 1042, 1047, 75 L.Ed. 2d 1 (1983) derives from the view that

> [o]ur system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his export, and no foreign state will

by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation from any. Such was the vision of the Founders....

*H.P. Hood & Sons, Inc. v. DuMond*, 336 U.S. 525, 539, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949).

The Supreme Court has developed a two-part dormant commerce clause analysis.

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (citations omitted). In contrast, state statutes and regulations that effect the economic isolation of the state by discriminating against interstate commerce in favor of local interests have been held to be *per se* unconstitutional.

> [W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders.

*City of Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed. 2d 475 (1978). The plaintiff contends that section 23–19–13.1 of the Rhode Island General Laws is just such a protectionist measure since its practical effect is to erect a complete barrier to the disposal of out-of-state solid waste in Rhode Island.

### B.

The plaintiff correctly notes that any discussion of the constitutionality of a state

statute that effectively bans the disposal of out-of-state waste must begin with an analysis of *City of Philadelphia v. New Jersey,* 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). In *City of Philadelphia,* the United States Supreme Court considered the constitutionality of a New Jersey statute that prohibited the importation of most "solid or liquid waste which originated or was collected outside the territorial limits of the State. . . ." *Id.* at 618, 98 S.Ct. at 2532.

In considering the Commerce Clause implications of the New Jersey statute, the Court first rejected the notion that waste is not an item of interstate commerce. As the Court stated, "All objects of interstate trade merit Commerce Clause protection; none is excluded at the outset." *Id.* at 622, 98 S.Ct. at 2534. The Court also refused to resolve the parties' debate as to the true purpose of the legislation; the Court conceded that either argued purpose—environmental protection or reduction of disposable costs for New Jersey residents—would legitimately support the statute. However, in the Court's view, the goals of the legislation were irrelevant to its analysis of the legislation's constitutionality because "the evil of protectionism can reside in legislative means as well as legislative ends." *Id.* at 626, 98 S.Ct. at 2536–37. The Court concluded that "[W]hatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in its plain effect, [the New Jersey statute] violates this principle of nondiscrimination." *Id.* at 626–27, 98 S.Ct. at 2637.

Although the New Jersey statute at issue in *City of Philadelphia* applied to all in-state landfills, both public and private, while the Rhode Island statute applies only to the state-subsidized Central landfill, in its practical effect, section 23–19–13.1 is identical to the New Jersey statute inasmuch as the Central landfill is the only solid waste repository in Rhode Island. Both statutes act to close their respective states' borders to out-of-state waste. How-

ever, the Rhode Island statute's sole application to a state-funded landfill is, for purposes of Commerce Clause scrutiny, a critical distinction. While the Court held in *City of Philadelphia* that "[t]he New Jersey law at issue ... squarely falls within the area the Commerce Clause puts off limits to state regulation" because "[o]n its face, it imposes on out-of-state commercial interests the full burden of conserving the State's remaining landfill space" *id.* at 627–28, 98 S.Ct. at 2537, it "express[ed] no opinion about New Jersey's power, consistent with the Commerce Clause to restrict to state residents access to state-owned resources, or New Jersey's power to spend state funds solely on behalf of state residents and businesses[.]" *Id.* at 627 n. 6, 98 S.Ct. 2537 n. 6 (citing *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976)). Because the Central landfill is operated by a public agency and partially funded by the State of Rhode Island, the action of the legislature falls within the reservation expressed in footnote six of the Supreme Court's decision. Indeed, the question facing this Court today is the question left unanswered in *City of Philadelphia:* whether the public character of the Central Landfill exempts the state's action from the restraints of the Commerce Clause.

### C.

The Supreme Court has held that a State or local government is not subject to the restrictions of the Commerce Clause when it acts as a "market participant" as opposed to a "market regulator". The defendants argue that RISWMC's operation and the state's funding of the Central Landfill makes the State of Rhode Island a participant in the solid waste disposal market such that its actions in limiting access to the Central Landfill do not run afoul of the Commerce Clause.

The Supreme Court first enunciated the market participant exception to the Commerce Clause in *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). *Alexandria Scrap* concerned a Maryland bounty program de-

signed to rid the state of abandoned automobiles. The Maryland program offered a bounty to scrap processors for every Maryland-titled junk automobile that was converted into scrap. Both in-state and out-of-state processors were entitled to receive the bounties upon presentation of the required title documentation. The documentation requirement did not originally apply to so-called "hulks", abandoned automobiles over eight years old. Five years after the program was initiated, the state extended the title-documentation requirements to hulks; the new law also imposed more onerous documentary requirements on out-of-state processors seeking to participate in the bounty program. The net effect of the documentation requirements was to divert the market in hulks to Maryland scrap processors. *See id.* at 796–802, 96 S.Ct. at 2491–94. The plaintiff, a Virginia-based scrap processor challenged the amended bounty program on the grounds that it imposed an impermissible burden on interstate commerce since the program's goals could be achieved with a lesser impact on out-of-state interests. *See id.* at 804, 96 S.Ct. at 2495.

The Court rejected the plaintiff's basic premise "that every action by a state that has the effect of reducing in some manner the flow of goods in interstate commerce is potentially an impermissible burden." The Court stated that it was "not persuaded that Maryland's action in amending its statute was the kind of action with which the Commerce Clause is concerned." *Id.* at 805, 96 S.Ct. at 2495. The Court found that Maryland had not inhibited the natural functioning of interstate trade. "Maryland has not sought to prohibit the flow of hulks, or to regulate the conditions under which it may occur. Instead it has entered into the market itself to bid up their price." *Id.* at 806, 96 S.Ct. at 2496. The Court characterized the State of Maryland "as a purchaser, in effect, of a potential article of interstate commerce" who had "restricted its trade to its own citizens or businesses within the State." *Id.* at 805, 96 S.Ct. at 2497. Having found Maryland to be a market purchaser, the Court concluded, "Nothing in the purposes animating the Com-

merce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Id.* at 810, 96 S.Ct. at 2498 (footnotes omitted).

The Supreme Court reaffirmed the broad holding of *Alexandria Scrap* in *Reeves, Inc. v. State,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), noting:

> The basic distinction drawn in *Alexandria Scrap* between States as market participants and States as market regulators makes good sense and sound law. As that case explains the Commerce Clause responds principally to state taxes and regulatory measures impeding free private trade in the national marketplace. There is no indication of a constitutional plan to limit the ability of the states themselves to operate freely in the free market.

*Id.* at 436–37, 100 S.Ct. at 2271 (citations omitted).

In *Reeves,* the Supreme Court considered whether a state could give preference to state residents in the sale of cement manufactured at a state-owned and operated cement plant without violating the Commerce Clause. South Dakota had built a cement plant in 1919 to alleviate a regional cement shortage. For many years, the plant produced a cement surplus which it sold to out-of-state customers, one of whom was Reeves, Incorporated, a Wyoming concrete distributor. In 1978, the plant faced an output shortage and thus invoked a long-standing but usually unenforced policy of affording South Dakota buyers preferential treatment. Reeves, who relied on the South Dakota plant for approximately 95% of its cement supply, brought suit challenging the plant's preferential policy. *See id.* at 430–33, 100 S.Ct. at 2274–75.

Reeves argued that the South Dakota policy was instituted solely to achieve a protectionist objective and thus was *per se* invalid. The Court rejected this contention stating:

> We find the label "protectionism" of little help in this context. The State's refusal to sell to buyers other than South

Dakotans is "protectionist" only in the sense that it limits benefits generated by a state program to those who fund the state treasury and whom the State was created to serve. Petitioner's argument apparently also would characterize as "protectionist" rules restricting to State residents the enjoyment of State educational institutions, energy generated by a State-run plant, police and fire protection, and agricultural improvement and business development programs. Such policies, while perhaps "protectionist" in a loose sense, reflect the essential and patently unobjectionable purpose of state government—to serve citizens of the State.

*Id.* at 442, 100 S.Ct. at 2280 (footnote omitted). The Court also rejected Reeves' argument that extending the market participant exception to the cement plant would allow South Dakota to hoard its native natural resources. The Court noted that while this argument was "rooted in the core purpose of the Commerce Clause", cement is not a natural resource like minerals or timber, but

is the end product of a complex process whereby a costly physical plant and human labor act on raw materials. South Dakota has not sought to limit access to the State's limestone or other materials used to make cement. Nor has it restricted the ability of private firms or sister States to set up plants within its borders. Moreover, petitioner has not suggested that South Dakota possesses unique access to the materials needed to produce cement. Whatever limits might exist on a State's ability to invoke the *Alexandria Scrap* exemption to hoard resources which by happenstance are found there, those limits do not apply here.

*Id.* at 443–44, 100 S.Ct. at 2281.

In *White v. Massachusetts Council of Construction Employers,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), the Supreme Court upheld the constitutionality of an executive order issued by the Mayor of Boston, Massachusetts which required a workforce comprised of at least 50% Boston residents, 25% minorities and 10% wom-en on all construction projects funded directly by the city or by federal grants or other sources administered by the City. *See id.* at 205–06 & n. 1, 103 S.Ct. at 1043–44. In concluding that Boston was acting as a participant in the construction market, the Court reaffirmed the essential proposition of *Alexandria Scrap* and *Reeves*

that when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause. As we said in *Reeves,* in this kind of case there is "a single inquiry: whether the challenged 'program constituted direct state participation in the market.'"

*Id.* at 208, 103 S.Ct. at 1044–45 (quoting *Reeves,* 447 U.S. at 436 n. 7, 100 S.Ct. at 2277 n. 7).

### D.

Although Rhode Island bought, currently operates and partially funds the Central Landfill, the plaintiff contends that applying the market participant exception would be inappropriate in these circumstances. The plaintiff argues that because landfill sites are a natural resource and because the State of Rhode Island currently holds a monopoly in that resource, that the Rhode Island Solid Waste Management Corporation has a duty to deal with out-of-state customers parallel to the duty imposed on private interests by federal antitrust law. In support of its contentions, the plaintiff primarily relies upon the Supreme Court's decision in *South-Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984).

In *South-Central Timber Development,* the Supreme Court held that an Alaska regulation that required purchasers of state-owned timber to process the timber in Alaska prior to export violated the negative implications of the Commerce Clause. The Court rejected the state's argument that the processing restriction was valid under *Alexandria Scrap* and *Reeves.* The Court opined that, unlike the *Alexandria Scrap* bounty program through which the State of Maryland entered the scrap market as a

purchaser, "Alaska participates in the timber market, but imposes conditions downstream in the timber-processing market." *Id.* at 95, 104 S.Ct. at 2244. The Court also rejected the notion that *Reeves* controlled its inquiry. The Court stated that:

> Although the Court in *Reeves* did strongly endorse the right of a State to deal with whomever it chooses when it participates in the market, it did not—and did not purport to—sanction the imposition of any terms that the State might desire. For example, the Court expressly noted in *Reeves* that "Commerce Clause scrutiny may well be more rigorous when a restraint on foreign commerce is alleged;" that a natural resource "like coal, timber, wild game, or minerals," was not involved, but instead the cement was "the end product of a complex process whereby a costly physical plant and human labor act on raw materials;" and that South Dakota did not bar resale of South Dakota cement to out-of-state purchasers. In this case, all three of the elements that were not present in *Reeves* —foreign commerce, a natural resource, and restrictions on resale—are present.

*Id.* at 95–96, 104 S.Ct. at 2244–45 (citation omitted). The plaintiff here contends that because the Central Landfill is a natural resource and because section 23–19–13.1, as amended, bars all access to out-of-state haulers, application of the market participant exception would be unjust.

The plaintiff correctly notes that in distinguishing a cement plant from natural resources such as timber, minerals, and wild game, for which the Commerce Clause requires an unfettered national market, the Court in *Reeves* cited *City of Philadelphia v. New Jersey,* and parenthetically, landfill sites, in support. And plaintiff's position would be strong, indeed, if this Court were to accept plaintiff's underlying premise that Rhode Island is participating in the landfill site market. However, I believe that in operating the Central Landfill, Rhode Island has entered the market for landfill services and is therefore not a participant in a natural-resource market. In defining the relevant market as landfill services, I am persuaded by the reasoning of

the Court of Appeals of Maryland, which addressed this question in the context of a private refuse hauler's challenge to a county ordinance prohibiting the disposal of out-of-county refuse at a county-owned landfill. The Court wrote:

> The market in which the County participates in the operation of the Disgah landfill is not waste. The County neither buys nor sells refuse deposited in its landfill. Rather, it provides a service to [the plaintiff] and the other private waste haulers, *i.e.,* for a fee, the County accepts the waste they have collected, compacts it and covers it with soil so that its final disposal complies with all applicable environmental and health laws. Therefore, for purposes of the market participant analysis in this case, the market is landfill services.

*County Commissioners of Charles County v. Stevens,* 299 Md. 203, 473 A.2d 12, 19 (1984); *accord Evergreen Waste Systems, Inc. v. Metropolitan Service District,* 643 F.Supp. 127, 132 (D.Or.1986); *Shayne Bros. Inc. v. District of Columbia,* 592 F.Supp. 1128, 1134 (D.D.C.1984).

■ The distinction between a market in landfill services and landfill sites is not illusory; the difference is easily discerned by examining what has been closed to the plaintiff since the amendment of section 23–19–13.1. This statutory amendment has deprived the plaintiff and other out-of-state refuse haulers of their ability to deposit waste to be processed in the state-operated Central Landfill. The amendment has not, however, precluded any party, in-state or foreign, from purchasing property upon which to construct a sanitary landfill open to all waste regardless of origin. Indeed, as the parties have stipulated, four such license applications are currently pending before the state authorities. In operating the Central Landfill, Rhode Island has done nothing more than purchase a natural resource, *i.e.,* the landfill site, and offer to its customers the service of waste processing.

■ This distinction also illustrates why *City of Philadelphia,* as cited in *Reeves,* is inapposite to the controversy at hand. The

statute at issue in *City of Philadelphia* applied to all public and private landfills in New Jersey, thus, out-of-state haulers were not only excluded from using the waste processing services available at existing landfills, but the statute also made it impossible for them to purchase landfill space to meet their needs. Any landfill space they might have purchased would have been subject to the statute's proscription. Therefore, unlike the Rhode Island statute challenged here, the New Jersey statute effectively closed both the market in waste processing,—a service—and the market in landfill sites—a natural resource.

■ Finally, plaintiff contends that, because RISWMC currently holds a monopoly in landfill services in Rhode Island, the Court should craft a "monopoly exception" to the market participant doctrine. Essentially, the plaintiff urges the Court to impose a duty on the defendants to deal with out-of-state refuse haulers. This Court declines to follow the plaintiff's suggestion. While Rhode Island admittedly holds a monopoly in landfill services, I can see no distinction between this monopoly and the monopoly the State and its municipalities hold in educational services, or in police and fire protection. Certainly Rhode Island is not expected to extend these services to out-of-state residents; the same is true of landfill services. As the Court in *Shayne Bros.* stated in the same context:

> The District [of Columbia] is expending a public resource, as much so as the money in its treasury or the services of its police, firefighters and teachers, albeit upon terms which prefer its citizens over others, and that is precisely what the Supreme Court has thrice now held that a state is entitled to do without offending the Commerce Clause.

*Shayne Bros.*, 592 F.Supp. at 1134.

In sum, this Court concludes that the State of Rhode Island is a participant in the landfill services market and that its amendment of R.I.Gen.Laws section 23–19–13.1 does not violate the Commerce Clause of the United States Constitution.

## III. THE CONTRACT CLAUSE

### A.

■ Plaintiff contends that the amendment of Rhode Island General Laws section 23–19–13.1 violates the Contract Clause of the United States Constitution. On September 29, 1986, Blackstone and RISWMC entered into an agreement which allowed Blackstone to dispose of Massachusetts waste at the Central Landfill so long as the amount of waste deposited at the landfill did not exceed the total amount of Rhode Island waste Blackstone collected on a monthly basis. Plaintiff contends that the Rhode Island statute abrogates this contractual agreement and thus violates the Contract Clause prohibition against state legislation that impairs the obligations of contracts.

Article 1, Section 10 of the United States Constitution provides, "No State shall ... pass any ... Law impairing the Obligation of contracts...." Although the language of the Contract Clause is facially absolute, it is well-settled that its prohibition against the impairment of contractual obligations is not to be read literally. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, —— U.S. ——, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987); *Exxon Corp. v. Eagerton*, 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed. 2d 497 (1983); *Local Division 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 639 (1st Cir.1981), *cert. denied*, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982). As the Supreme Court has long recognized, the mandate of the Commerce Clause "must be accommodated to the inherent police power of the State 'to safeguard the vital interests of its people.'" *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934)). "[I]t is to be accepted as a commonplace that the Contract Clause does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 243, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978). Indeed,

[I]t is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which, in its various ramifications, is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals.

*Manigault v. Springs*, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905). This is not to say, however, that the Contract Clause is utterly moribund and imposes no limits upon the power of a State to abrogate established contractual relationships in the legitimate exercise of its police power. Indeed, it is not, and it is precisely those limits the plaintiff seeks to test.

The Supreme Court's recent interpretations of the Contract Clause and its limitations instruct that any analysis of state legislation under the Contract Clause involves essentially a three-part inquiry. First, as a threshold matter, the Court must determine whether the state law has operated as a substantial impairment to the rights owing to a plaintiff under a contractual relationship. *See United States Trust Co. v. New Jersey*, 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977); *Allied Structural Steel*, 438 U.S. at 244, 98 S.Ct.

at 2722, *Energy Reserve Group*, 459 U.S. at 411, 103 S.Ct. at 704. Second, if the Court finds that the state statute or regulation at issue has caused a substantial impairment of the plaintiff's contractual rights, the State must demonstrate that a significant and legitimate public purpose justifies the regulation. *See United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1517; *Allied Structural Steel*, 438 U.S. at 244, 98 S.Ct. at 2722, *Energy Reserves Group*, 459 U.S. at 411–12, 103 S.Ct. at 704–05. Finally once the Court has identified a legitimate public purpose behind the legislation, it must inquire as to "whether the adjustment of the 'rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 705 (quoting *United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1518). And unless the State is a party to the contract, as is usual in reviewing economic or social legislation, the Court properly defers to the judgment of the legislature as to the reasonableness and necessity of the legislative action at issue. *Id.* at 412–13, 103 S.Ct. at 705; *United States Trust*, 431 U.S. at 22–23, 97 S.Ct. at 1518.

### B.

As a preliminary matter, this Court must determine whether the amendment of R.I. Gen. Laws section 23–19–13.1 has impaired the plaintiff's rights under the Agreement with RISWMC.[1]    The plaintiff argues,

---

1. The precise terms of the Agreement provide:

AGREEMENT between Rhode Island Solid Waste Management Corporation, a public agency hereafter designated as RISWMC and John M. LeFrancois, dba Blackstone Valley Disposal Service, 144 Lakeshore Drive, Blackstone, Massachusetts, hereafter designated as BVD.

WHEREAS, BVD is a commercial hauler of waste doing business in Massachusetts and Rhode Island, more specifically within Rhode Island and southeastern Massachusetts;  and

WHEREAS, in the process of the collection of waste, BVD operates frequently across state lines collecting trash from both states in the same vehicle;  and

WHEREAS, BVD deposits waste in the Central Landfill operated by RISWMC and in various landfills in the Commonwealth of Massachusetts;  and

WHEREAS, BVD frequently brings unmixed waste across state lines to both the Central Landfill and to various Massachusetts landfills;  and

WHEREAS, RISWMC has a policy against the disposal of out-of-state waste at the Central Landfill, but is willing to make allowances to compensate for Rhode Island waste disposed of in Massachusetts landfills by BVD under its unique situation;

NOW, therefore, it is agreed as follows:

1. RISWMC agrees to accept out-of-state waste at the Central Landfill from BVD with-

quite simply, that its Agreement with the RISWMC allowed it to deposit an equivalent amount of Massachusetts refuse in Rhode Island as it deposits Rhode Island refuse in Massachusetts and that this right under the Agreement has been completely abrogated by the Rhode Island Statute. This Court's inquiry must, however, go further.

In determining whether there has been a substantial impairment of the parties' contractual relationship, it is necessary for this Court to examine the reasonable expectations of the parties; as the Supreme Court has noted, "state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute an impairment." *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704. The defendants contend that the plaintiff's rights under the Agreement were, as a matter of Rhode Island law, terminable at will, thus, the plaintiff lost no greater right owing to the enactment of the legislation at issue than it retained under the Agreement; the RISWMC was equally entitled to terminate the Agreement at any time.

The Supreme Court has long acknowledged that in ascertaining the obligations of a contract, courts may consider not only the express terms of the contract, "but also the contemporaneous state law pertaining to interpretation and enforcement," on the premise that the contracting parties would have relied on such law in reaching the terms of their bargain. *United States Trust*, 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17; *see also Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. at 429–30, 54

S.Ct. at 237. And as the Rhode Island Supreme Court has ruled, "where the duration of a contract is uncertain, it is for an indefinite term and therefore terminable by either party at will." *Bader v. Alpine Ski Shops, Inc.*, —— R.I. ——, 505 A.2d 1162, 1166 (1986). Moreover, the provision that provided for termination of the Agreement in the event of Blackstone's noncompliance, see *supra* note 1, does not detail the only condition for the Agreement's termination. The Court in *Bader* rejected such a suggestion in connection with an employment contract for an indefinite term which stated as one of its terms, "[w]hen and if the ski shop becomes unprofitable, either party may terminate the employment for any reason...." *Id.*

The defendants further contend that any rights the plaintiff assumed under the contract were subject to state regulation, and that the Agreement, by its terms, placed the plaintiff on notice of Rhode Island's policy against the disposal of out-of-state waste at the Central Landfill. As the Supreme Court has stated, "In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704. As a waste disposer who "purchased into an enterprise already regulated into which he now objects", defendants essentially argue that the plaintiff "purchased subject to further legislation on the same topic." *Id.* (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 60 S.Ct. 792, 794–95,

out requirement of an affidavit designating its source, so long as the percentage of waste disposed of at the Central Landfill by BVD does not exceed the percentage of Rhode Island waste BVD collects on a monthly basis of the total waste collected by BVD.

2. RISWMC agrees to charge and BVD agrees to pay the standard commercial rate charged for Rhode Island waste for waste delivered pursuant to Paragraph 1.

3. In lieu of affidavit, BVD will provide verification of compliance with the provisions of Paragraph I in the form of a specialized audit whose format will be agreed to between the parties by an independent certified public accounting firm of BVD's choice, engaged at its expense, on a bi-monthly basis. The first re-

porting period shall end on the 31st day of October and each successive reporting period should occur thereafter on a bi-monthly basis. Audit reports shall be filed no later than 45 days from the completion of the reporting period.

4. To the extent, a review of the records by RISWMC, which shall have access to any and all records it shall reasonably require, of the independent audit provided by BVD discloses that the tonnage disposed of by BVD at the Central Landfill exceeds the permitted percentage under Paragraph I whereof, RISWMC shall charge and BVD agrees to pay upon demand the sum of $60.00 per ton for such coverage.

84 L.Ed. 1061 (1940)). In the oft-quoted words of Justice Holmes, "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908).

There can be little doubt that, in enacting Chapter 19 of Title 23 of the Rhode Island General Laws, the Rhode Island legislature has implemented a comprehensive regulatory scheme to address the long-term problem of waste disposal in Rhode Island. Indeed, there is much force to the defendants' contention that the statutory enactment in question here did not impair Blackstone's rights under the agreement, inasmuch as the contract was terminable at will and subject to the continuing regulation of RISWMC and the Rhode Island legislature. However, in the interest of the expedient resolution of this controversy, I will consider the Contract Clause question on the assumption that plaintiff's rights under the contract have in fact, been impaired by the amendment of R.I. Gen. Laws section 23–19–13.1. Thus, the question remaining is whether the impairment to plaintiff's contract rights is permitted under the Constitution.

### C.

Having assumed that the statute at issue has caused a substantial impairment of the obligations owed to the plaintiff under its Agreement with the RISWMC, this Court must now determine whether there is a significant and legitimate public purpose justifying the statutory amendment. In evaluating the purpose behind the legislation, I am mindful that "[t]he severity of the impairment measures the height of the hurdle the state legislation must clear.... Severe impairment ... will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Allied Structural Steel*, 438 U.S. at 245, 98 S.Ct. at 2722–23. As I have assumed the total impairment of Blackstone's rights un-

der the Agreement, the hurdle is indeed high.

In analyzing whether the State legislation in question serves a significant and legitimate public purpose, courts have generally examined whether the legislation seeks to remedy a broad social or economic problem. *See Energy Reserves Group*, 459 U.S. at 411–12, 103 S.Ct. at 704–05. In order to survive judicial scrutiny, the regulation must "impose [ ] a generally applicable rule of conduct designed to advance 'a broad societal interest.'" *Exxon Corp. v. Edgerton*, 462 U.S. at 191, 103 S.Ct. at 2306. At the core of the inquiry, courts have sought to guarantee that the State is exercising its police power and not just providing a legislative benefit to special interests. *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 705. It is my view that the legislative purpose behind the amendment of R.I. Gen. Laws section 23–19–13.1 satisfies this test.

Apart from seeking to preserve the limited capacity of the Central Landfill for the Rhode Island residents who support it, in enacting legislation to close the Central Landfill to out-of-state trash, the Rhode Island legislature declared its policy to be that "the Rhode Island solid waste management corporation will operate the central landfill in a manner designed to afford to the environment and to the citizens of the state who reside near the landfill the maximum protection which is available for the land disposal of rubbish." R.I.Gen.Laws section 23–19–3 (as amended, 1987). There can be little doubt that the protection of the environment is a broad societal interest which is well within the authority of the state to protect. It falls within the long-accepted definition of a state's police powers "as an exercise of the sovereign right of the Government to protect the lives, health, morals, comforts, and general welfare of the people....", *Manigault v. Springs*, 199 U.S. at 480, 26 S.Ct. at 130. Courts have recognized "the importance of allowing states to legislate freely on social and economic matters of importance to their citizens, modifying the law to meet changing needs and conditions." *Local Division 589*, 666 F.2d at 639. Moreover, the goal

of environmental protection is not one which limits its benefits to special interests within the state. The benefits of environmental protection devolve not only upon those Rhode Islanders who live in the immediate vicinity of the landfill, but also upon all citizens of the state who depend upon the Solid Waste Management Corporation to provide environmentally sound methods of waste disposal.

Because the Rhode Island legislation attempts to remedy an important general social problem, namely, the safe disposal of solid waste, it stands in stark contrast to legislation which the Supreme Court has held to be invalid because it lacked this essential goal. In *Allied Structural Steel v. Spannaus*, the Supreme Court struck down a Minnesota statute that imposed a "pension funding charge" upon private employers of one hundred or more employees—of whom at least one was a Minnesota resident—a "pension funding charge" in the event the employer terminated its own pension plan or closed an office in the State. This charge was assessed if the employer's pension funds were insufficient to cover the full pensions of employees who had worked at least ten years, even if those employees had no vested pension rights under the employer's pension plan. *Allied Structural Steel*, 438 U.S. at 238–30, 98 S.Ct. at 2719–20. The Court ruled that the legislation at issue did not pass constitutional muster because there was no evidence on the record that the legislation was necessary to solve an important social problem. Indeed, the Court noted that the legislation was narrowly focused on a very limited group of private employers, and sought to protect a narrow class of employees rather than a broad societal interest. *Id.* at 247–249, 98 S.Ct. at 2724. The Court also noted, that the legislation did not operate in an area already largely regulated at the time the plaintiff undertook to provide employee pension benefits, but instead represented a foray into a previously unregulated area. *Id.* at 250, 98 S.Ct. at 2725. This is clearly not the case with the Rhode Island statute challenged here.

Since this Court has determined that the amendment to R.I.Gen.Laws section 23–19–

13.1 serves a legitimate public purpose, the only remaining issue for purposes of Contract Clause analysis is whether the legislature's "adjustment of 'the rights and responsibilities of contracting [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption.'" *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 704 (quoting *United States Trust*, 431 U.S. at 22, 97 S.Ct. at 1517).

### D.

In arguing that the outright prohibition of out-of-state waste is neither reasonable nor appropriate to the public purpose behind the legislation's enactment, the plaintiff relies upon *United States Trust Co. v. New Jersey*, in which the Supreme Court invalidated a New Jersey statute that repealed a prior statutory covenant enacted by New York and New Jersey that had circumscribed the ability of the Port Authority of New York and New Jersey to subsidize passenger rail service from its revenues. The suit was filed on behalf of holders of Port Authority Consolidated Bonds who had relied upon the covenant in purchasing the bonds. *United States Trust Co.*, 431 U.S. at 2, 97 S.Ct. at 1508. The Court found that the covenant's repeal indeed impaired a contractual obligation, *id.* at 21, 97 S.Ct. at 1517, and although it identified a legitimate public purpose in the State's desire to promote mass transportation, energy conservation and environmental protection, *id.* at 28, 97 S.Ct. at 1521, it concluded that repeal of the covenant was neither reasonable nor necessary. *Id.* at 31, 97 S.Ct. at 1522.

In striking down the covenant's repeal on the grounds that it was unnecessary and unreasonable, the Supreme Court concluded that a total repeal of the covenant was not necessary to serve the goal of subsidizing commuter railroads, that a less dramatic modification would serve these ends as well. The Court noted that the States could have used alternative means to achieve their objectives, and that circumstances had not changed in the twelve-year period between the covenant's adoption and

repeal which would support the reasonableness of the repeal. Because the repeal involved impairment of a contract to which the State was a party, the Court rejected the notion that the State was free as a matter of legislative discretion to choose the alternative it preferred best. "[A] state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *Id.* at 30–31, 97 S.Ct. at 1522.

The plaintiff contends that in dealing with the problem of overcrowding at the Central Landfill, Rhode Island could have taken less drastic steps than an outright ban on the importation of out-of-state trash. The plaintiff argues that the State could have increased the size of the landfill space available by purchasing other suitable property; alternatively, the state could have begun planning to build trash incinerators in the state well in advance of the need for this legislation. The plaintiff also notes that the State could have delayed passage of the legislation until suitable private landfill space had been licensed. Finally, plaintiff relies upon the RISWMC's Statewide Resource Recovery System Development Plan (attached as Exhibit B to the Statement of Stipulated Facts) which states:

It is the Corporation's conclusion that additional landfill capacity for the disposal of unprocessed commercial or municipal solid waste should not be installed at this time.... There is no such need now nor is need expected to occur within the next five years. It is expected, under very conservative assumptions, that there would be sufficient capacity at the Central Landfill to provide for disposal of solid waste until the year 2005, provided the Corporation's proposed redesign of the Central Landfill is approved by [the Department of Environmental Management]. With an anticipated lead time of about 18 to 19 years available, there is no need at this time to begin planning for additional active landfill capacity for the disposal of unprocessed solid waste.

(Exhibit B to Statement of Stipulated Facts at 12–1).

Plaintiff's arguments would have some merit if closing the Central Landfill to out-of-state waste was the only step Rhode Island had taken to solve the state's waste-disposal problems. However, as the parties have stipulated, RISWMC has taken several steps to extend the useful life of the Central Landfill. RISWMC has issued $160,000,000 in revenue bonds to finance a mass burn resource recovery plant in North Kingstown, Rhode Island; it has spent 3.6 million dollars on plant and equipment to house a recycling center at the Central Landfill; it is in final negotiations for construction of a mass burn resource recovery facility to be located at the Central Landfill; and RISWMC has been mandated to construct a third mass burn facility, the size of which is to be determined in accordance with the Statewide Resource Recovery System Development Plan. Clearly, banning the deposit of outside trash at the Central Landfill is only one piece of a comprehensive plan to handle the problems of solid waste disposal in Rhode Island. Furthermore, plaintiff's reliance on the State-wide Resource Recovery System Development Plan is misleading; RISWMC's conclusion that no new landfill space will be needed for the next five years was made in the context of RISWMC's policy that "[t]he landfilling of raw, unprocessed solid waste should be avoided unless there is an overwhelming preponderance of evidence which indicates that additional landfill capacity for the disposal of unprocessed solid waste will be unavoidably needed within five years." RISWMC added:

This conclusion is consistent with Policy number 3 of the Corporation that the disposal of unprocessed solid waste in sanitary landfills should be minimized and should not be utilized unless there are no other management or disposal alternatives. This conclusion is also consistent with the first objective of the Corporation which establishes a hier-

archy of solid waste management methods in which land disposal is prioritized last.

(Exhibit B to Statement of Stipulated Facts at 12–1). Because the State was a party to the Agreement with Blackstone, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate." *United States Trust*, 431 U.S. at 26, 97 S.Ct. at 1519. However, despite the heightened scrutiny with which this legislation must be viewed, I believe that the amendment of section 23–19–13.1 was both reasonable and necessary to preserve the limited space at the Central Landfill.

The constitutional validity of the legislation in question in this case also rests upon a separate ground. As the Supreme Court opined in *United States Trust*, when a state has impaired its own contractual obligations through legislative action,

> the reserved-powers doctrine has a different basis. The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as *Fletcher v. Peck*, the Court considered the argument that "one legislature cannot abridge the powers of a succeeding legislature." 6 Cranch (10 U.S.) at 135, 3 L.Ed. 162 (1810). It is often stated that "the legislature cannot bargain away the police power of a State." *Stone v. Mississippi*, 101 U.S. (11 Otto) 814, 817, 25 L.Ed. 1079 (1880). This doctrine requires a determination of the State's power to create irrevocable contract rights, in the first place, rather than an inquiry into the purpose of reasonableness of the subsequent impairment.

*United States Trust*, 432 U.S. at 23, 97 S.Ct. at 1518; *see also Local Division 589*, 666 F.2d at 642 (distinguishing, for purposes of Contract Clause scrutiny, laws which impair a state's financial obligations as opposed to its police powers). As this Court has noted, protection of a State's environment and its citizens' health is a legitimate exercise of its police powers. Thus, even if the legislation at issue was not reasonable or necessary to achieve the public purpose behind its enactment, it is nonetheless valid under the Contract Clause because "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *United States Trust*, 431 U.S. at 23, 97 S.Ct. at 1518.

## IV. THE PRIVILEGES AND IMMUNITIES CLAUSE

■ Article IV, section 2 of the United States Constitution provides "The Citizens of each State shall be entitled to all Privileges and Immunities in the several States." The Privileges and Immunities Clause acts essentially to "bar discrimination against citizens of other states where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer v. Witsell*, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 42 L.Ed. 1460 (1948). Because the plaintiff removes as much waste from Rhode Island as he brings to the Central Landfill, he contends that the Rhode Island statute barring the deposit of out-of-state waste at the Central Landfill unjustifiably discriminates against him because he is a citizen of Massachusetts.

I find the plaintiff's contention to be utterly devoid of merit. The Privileges and Immunities Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Id.* at 395, 68 S.Ct. at 1162 (footnote omitted). In this case, Rhode Island and Massachusetts waste haulers enjoy the same privileges under the statute. Both Rhode Island and Massachusetts haulers may deposit waste generated in Rhode Island at the Central Landfill; neither Rhode Island nor Massachusetts haulers may deposit waste generated out-of-state at the Central Landfill. Thus, the amendment of R.I.Gen.Laws section 23–19–13.1 is not an unconstitutional violation of the privileges and immunities of plaintiff's citizenship.

## V. CONCLUSION AND ORDER

For the foregoing reasons, I find that R.I.Gen.Laws section 23–19–13.1, as amended, does not violate the Commerce Contract or Privileges and Immunities

Clauses of the United States Constitution. Accordingly, the plaintiff's motion for summary judgment is hereby denied, and judgment is ordered for the defendant.

*It is so ordered.*