**AUTOMATED SALVAGE TRANSPORT, INC.; Bria Rubbish and Recycling, Inc.; Connecticut Carting & Salvage Corp.; Connecticut Disposal Service, Inc.; D.P.L. Refuse Service, Inc.; Frank Perrotti & Sons, Inc.; Royal Refuse & Recycling, Inc.; Sanitary Refuse Company, Inc.; Quality Recycling and Disposal; C & D Sanitation & Recycling, LLC, Plaintiffs–Appellants,**

v.

**WHEELABRATOR ENVIRONMENTAL SYSTEMS, INC.; Bridgeport Resco Company, L.P.; Riley Energy Systems of Lisbon Corporation, Defendants–Appellees,**

**Connecticut Resources Recovery Authority, Intervenor– Defendant–Appellee.**

**No. 229, Docket 96–9281.**

United States Court of Appeals, Second Circuit.

Argued Aug. 29, 1997.

Decided Aug. 20, 1998.

William M. Bloss, New Haven, CT (David L. Belt, Alinor C. Sterling, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, of counsel), for Plaintiffs–Appellants.

J. Anthony Downs, Boston, MA (A. Lauren Carpenter, Goodwin, Procter & Hoar, LLP, Boston, MA, of counsel), for Defendants–Appellees.

Everett E. Newton, New Haven, CT (Barry J. Waters, April L. Lieberman, Murtha Cullina Richter & Pinney, New Haven, CT, of counsel), for Intervenor–Defendant–Appellee.

Before MESKILL and JACOBS, Circuit Judges, and KORMAN, District Judge.*

KORMAN, District Judge:

The Connecticut Resources Recovery Authority ("CRRA") was created by the Connecticut General Assembly in 1973. Since then, "CRRA has developed and maintained a vast system of solid waste management projects, under a Solid Waste Management Plan, which include[s] waste-to-energy plants...." Amended Complaint ¶ 7. The Solid Waste Management Plan, which was promulgated by Connecticut's Department of Environmental Protection ("DEP") pursuant to express legislative directive, Conn.Gen. Stat § 22a–211, "abandoned landfilling in favor of transporting waste via transfer stations or directly to trash-to-energy plants for ultimate disposal." Amended Complaint ¶ 7.

CRRA owns four of the six trash-to-energy plants currently operating in Connecticut. These four plants, which were constructed by CRRA with the proceeds of bonds issued by CRRA, are in Hartford, Preston, Wallingford, and Bridgeport, and serve over two-thirds of the cities and towns in Connecticut pursuant to long-term contracts by which these cities and towns committed themselves to dispose of their waste.[1] A fifth waste-to-energy plant is located in Bristol, Connecticut, and is privately "owned, operated and/or controlled" by Ogden Systems, Inc. Amended Complaint ¶ 9.

The opening of Connecticut's sixth waste-to-energy facility in Lisbon by defendant, Wheelabrator Environmental Systems (and related defendants), provides the backdrop for this lawsuit. *See generally Connecticut Resources Recovery Authority v. Commissioner of Environmental Protection*, 233 Conn. 486, 488–96, 659 A.2d 714, 715–19 (1995) (detailing history of CRRA opposition to permit). Specifically, CRRA challenged the decision of the Commissioner of Environmental Protection to permit the Lisbon waste-to-energy plant. CRRA invoked Conn.Gen.Stat. § 22a–208d, which was enacted to ensure that new solid waste disposal facilities would be permitted only if they would "not result in substantial excess capacity of resources recovery facilities...."

The challenge was ultimately resolved by the settlement agreement at the center of this case. CRRA agreed to withdraw its objection to the Lisbon facility permit in consideration for an agreement that addressed, *inter alia*, a problem caused by certain waste haulers including plaintiffs, Automated Salvage Transport, Inc. (and related plaintiffs). These waste haulers essentially interfered with the performance of long-term contracts that CRRA negotiated with Connecticut municipalities to commit the municipal solid waste to CRRA facilities for disposal at fixed long-term rates. Instead of delivering this waste to CRRA, plaintiffs hauled it to privately operated waste-to-energy plants with more favorable spot market rates. The settlement agreement requires both CRRA and the Wheelabrator defendants to respect one another's municipal contracts by rejecting deliveries of any waste committed to one another. In addition, if a hauler delivers waste committed to CRRA three times within a three-month period to the Wheelabrator defendants, the Wheelabrator defendants must refuse all deliveries of waste from that hauler for the next three months.

The settlement agreement is the subject of a Sherman Act and Commerce Clause complaint. Plaintiffs allege that the settlement agreement is a *per se* antitrust violation because it is "an unlawful contract, combination and conspiracy" to maintain an alleged CRRA monopoly over Connecticut waste disposal, Amended Complaint ¶¶ 11, 13(e), and that it violates the Commerce Clause because it "unreasonably restrain[s] free trade and interstate commerce." Amended Complaint ¶ 13(h). Since the defendants have asserted the state action immunity defense to the

---

* Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

1. The Hartford. Preston, and Wallingford plants are "owned, operated and/or controlled" in conjunction with either Ogden Systems, Inc., or American Refuel, Amended Complaint ¶ 9, neither of whom is a party to this case. The Bridgeport plant is allegedly "operated and/or controlled in conjunction with the Wheelabrator defendants." *Id.*

antitrust cause of action and the market participant defense to the Commerce Clause cause of action, a brief history of the CRRA, and of the State of Connecticut's role in its creation and operation, is appropriate before we discuss plaintiffs' challenge to this settlement agreement.

## Background

In 1973, after decades of reliance on landfills, the Connecticut legislature recognized that the State's "prevailing solid waste disposal practices ... result[ed] in unnecessary environmental damage, waste[d] valuable land and other resources, and constitute[d] a continuing hazard to the health and welfare of the people of the state." Conn.Gen.Stat. § 22a–258. Worse yet, floor debates in the Connecticut General Assembly revealed that roughly ninety percent of these landfills were actually illegal. 16 (S–97) Senate Proceedings, Pt. 8, 1973 Sess., p. 3753 (remarks of Sen. Costello).[2] They continued to operate, violating clean air and landfill regulations, because there was simply no alternative means for waste disposal. Id. Unable to enforce the laws without aggravating the crisis, Connecticut's Department of Environmental Protection (DEP) was forced into a "holding action." Id. at 3761. In 1971, the Connecticut General Assembly ordered the DEP to study Connecticut's solid waste system, and develop a master solid waste disposal solution for the entire state.

The DEP unveiled the contours of its state-wide waste disposal plan in 1973, proposing "an antithesis to the burn and bury philosophy which ha[d] caused such a problem" for Connecticut. 16 (H–143) H.R. Proceedings, Pt. 8, 1973 Sess., p. 6665 (remarks of Rep. Harlow).[3] Rather than simply incinerating or landfilling Connecticut's solid waste, the DEP plan phased out these disposal methods in favor of recycling and energy recovery. In the DEP's model, which has since become common across the nation, residents would "segregate" their waste, separating combustible materials from non-combustibles. The combustible waste would be sent to incinerators where it would be converted into energy, which, in turn, would be sold to utility companies. The non-combustible materials, such as aluminum, would be recycled. H. Rep. Tr. at 6658, 6666, 6692 (remarks of Rep. Harlow). Advocates of the solid waste plan touted it as not only environmentally sound but also "economically viable, perhaps the first plan in the country if not the world to provide a format which can ... provide positive economic benefits." Id. at 6669.

Even as the DEP was working out the plan's final details, the Connecticut General Assembly, deeming the plan's general strategy both sound and inevitable, passed implementing legislation during its 1973 session, rather than delay the solid waste crisis another year. See id. at 6659, 6667–78. This legislation created the Connecticut Resources Recovery Authority ("CRRA") as a "necessary state structure, which can take initiative and appropriate action to provide the necessary systems, facilities, technology and services for solid waste management and resources recovery." Conn.Gen.Stat. § 22a–258.

The Connecticut General Assembly rejected the landfill system in favor of an "appropriate governmental structure, processes and support ... so that effective state systems and facilities for solid waste management and large-scale resources recovery [could] be developed," Conn.Gen.Stat. § 22a–259(3), and so that "solid waste disposal services [could] be provided for municipal and regional authorities and private persons in the state, at reasonable cost, by state systems and facilities ... in accordance with the statewide solid waste management plan." Conn.Gen. Stat. § 22a–259(6).

The Connecticut General Assembly hoped that, by creating this state-wide authority to implement the DEP plan, Connecticut would benefit from an economy of scale, allowing more efficient and affordable development of necessary systems and technologies. See

---

2. The transcript of this Connecticut Senate floor debate (hereinafter "Sen. Tr.") was included in the Joint Appendix.

3. The transcript of this Connecticut House of Representatives floor debate (hereinafter "H. Rep. Tr.") was included in the Joint Appendix.

Conn.Gen.Stat. § 22a–258 (finding that "coordinated large-scale processing of solid wastes may be necessary in order to achieve maximum environmental and economic benefits for the people of the state" and that "the development of systems and facilities and the use of the technology necessary to initiate large-scale processing of solid wastes have become logical and necessary functions to be assumed by state government").

### A. CRRA's Self-Sustained Operation

CRRA was to fund itself by issuing $250 million in self-liquidating bonds. Sen. Tr. at 3751 (remarks of Sen. DeNardis). It was critical to the General Assembly that CRRA would repay these bonds through sales of its waste disposal services and recovered energy. *See, e.g.,* H. Rep. Tr. at 6687 (remarks of Rep. Dice) ("I'm not ... in favor of the state under-writing or ever subsequently having to pay from the state's funds as a whole to subsidize these matters from the towns. This is supposed to be a self-liquidating program."). *See also* Conn.Gen.Stat. § 22a–262(2) (directing CRRA to generate "revenues sufficient to provide for the support of the authority and its operations on a self-sustaining basis").

While the legislation creating CRRA did not preclude cities and towns from choosing alternatives to the CRRA-operated facilities, it was clear that once the CRRA facilities became operational the DEP would at last be free to enforce clean air and landfill regulations. *See* Sen. Tr. at 3761–62 (remarks of Sen. Costello). This enforcement would eliminate most, if not all, of CRRA's competition from landfills. Indeed, the bill creating CRRA was passed over objections that CRRA would simply condemn all of its private competitors. *See id.;* H. Rep. Tr. at 6686 (remarks of Rep. Camp); H. Rep. Tr. at 6698 (remarks of Rep. Varis); H. Rep. Tr. at 6699 (remarks of Rep. Pearson).

The Connecticut General Assembly further protected CRRA's financial stability by restricting the development of new waste-to-energy plants that would compete with CRRA for the supply of waste. *See* Conn. Gen.Stat. §§ 22a–208d(a), 22a–208d(c)(1)(I) (forbidding construction or expansion of disposal facilities that would create an excess capacity for municipal solid waste).

### B. The Diverted Waste Problem

Since its creation, CRRA has developed four of Connecticut's six resource recovery facilities, eleven transfer stations, and five landfills, enabling it to serve more than one hundred municipalities who have entered into long-term contracts committing their solid waste to its facilities. Connecticut General Assembly Legislative Program Review & Investigations Committee, "Connecticut Resources Recovery Authority: Solid Waste Management Fees" (December 1993) ("Legislative Report"), at i, 1, 11,[4] The facilities charge a "tipping" fee for each ton of waste they accept and process, and derive energy from the processed waste, which they then sell to utility companies. This revenue sustains the facilities' continued operation, and helps maintain their role in Connecticut's waste management system. *Id.* at 1, 19–20, 51–54. Several other towns are instead using the CRRA and private facilities on a spot basis. *Id.* at 11. These towns are essentially speculating on short-term price fluctuations in the "spot market," instead of committing to a set long-term price. *See id.* at 15–17, 35, 39.

In the years preceding the events leading to the complaint, CRRA was faced with a dwindling supply of contracted waste delivered to its facilities, caused by such unforeseen factors as economic recession and mandatory recycling programs enacted in the late 1980s and early 1990s. *Id.* at ii, 6–7, 32–34, 39. The shortage of contracted waste increased the demand and competition for

---

4. The Legislative Report was attached by the Wheelabrator defendants to the memorandum in support of their motion to dismiss. They argued, without apparent contradiction by plaintiffs, that it "may be considered by the Court without converting this motion into one for summary judgment." Mem. at 7 n. 2. The Legislative Report

was also included in the Joint Appendix. We decline to consider it in determining whether the district court properly dismissed the complaint. Rather, we refer to it here solely to provide a background for this controversy that is not inconsistent with the facts alleged in the amended complaint.

spot waste. As a result, the rates charged for spot waste plummeted to "historic lows", falling below those charged for contractually committed waste. *Id.* at 15, 34–35. In 1994, for example, while CRRA's Mid–Connecticut facility charged a $51 per ton tipping fee for committed waste, its spot fees ranged from $32 to $34. At the Southeast plant, spot prices averaged $40 per ton, in contrast to fees of $98 per committed ton. *Id.* at 15.

Rather than pay the higher fees required by the towns' long-term contracts, some waste haulers simply delivered the towns' waste to whichever waste management facility was cheapest in the spot market. *See id.* at 15–17, 34, 39. This practice exacerbated the shortages in committed waste delivery. *Id.* at ii, 17, 34, 39. This case arose from CRRA's effort to ensure that it received the waste to which it was contractually entitled without interference from waste haulers.

### C. The Settlement Agreement

Despite the overcapacity of waste-to-energy plants in Connecticut, the DEP issued a permit to the Wheelabrator defendants to open a sixth waste-to-energy plant in Lisbon. CRRA challenged the need for the new plant by intervening in the proceedings before the DEP, where it argued that the new facility would result in the "substantial excess capacity" forbidden by Conn.Gen.Stat. § 22a–208d. While the DEP ultimately decided to grant the permit for the Lisbon plant, it was not disputed that this facility would add to the then existing overcapacity in Connecticut. *See Connecticut Resources Recovery Authority v. Commissioner of Department of Environmental Protection,* 1994 WL 60061, at *5 (Conn.Super. Feb. 16, 1994) ("The Lisbon plant will undoubtedly reduce the availability of waste for each of these plaintiffs, the impact being greatest upon … [the] plant in Preston [which] is operating well below its capacity for lack of sufficient waste."), *appeal dismissed,* 233 Conn. 486, 659 A.2d 714 (1995). Nevertheless, the DEP chose to permit the Lisbon facility because it determined that the added capacity would become necessary by 1998—a matter that was also the subject of some controversy. *See, e.g.,* Legislative Report at 60–61 (recommending review of Lisbon decision and DEP decision-making process).

CRRA then commenced litigation seeking to overturn the DEP's decision and enjoin the plant's operational permitting. *See Connecticut Resources Recovery Authority v. Commissioner of the Department of Environmental Protection,* 1994 WL 60061. After holding that CRRA had standing to invoke the benefits of § 22a–208d, the Connecticut Superior Court accepted the DEP's finding that, although the plant was not yet necessary, it would become necessary by 1998. Nevertheless, the Superior Court found that the permit contained an invalid condition intended to limit the processing of out-of-state waste at the Lisbon facility. Because this invalid condition was "inextricably intertwined" with the DEP's determination of need, the case was remanded to the DEP to reconsider whether it would adhere to its conclusion that the Lisbon facility would become necessary. *Id.* at *16. Both CRRA and Wheelabrator attempted, unsuccessfully, to reopen the remand order. *See Connecticut Resources Recovery Authority v. Commission of the Department of Environmental Protection,* 1994 WL 197398 (Conn.Super.May 2, 1994); *Connecticut Resources Recovery Authority v. Commissioner of the Department of Environmental Protection,* 1994 WL 197381 (Conn.Super.May 3, 1994). The parties then appealed the remand order to the Connecticut Supreme Court, which dismissed the appeal on June 13, 1995, because the remand was not a final judgment. *Connecticut Resources Recovery Authority v. Commissioner of Environmental Protection,* 233 Conn. at 496–502, 659 A.2d at 719–22.

At this point, CRRA and Wheelabrator entered into the July 19, 1995 settlement agreement at issue in this case. Article VI of the settlement agreement reads, in pertinent part:

A. Deliveries of Waste Committed to Other Projects. [Wheelabrator] shall not accept and shall in fact reject deliveries of any waste known by [Wheelabrator] to be committed to any of the AUTHORITY'S Projects by written agreement (hereinafter the "Committed Waste") at any of the

following [Wheelabrator] or [Wheelabrator-affiliated] facilities: Lisbon, Connecticut, Bridgeport, Connecticut, Peekskill, New York, Millbury, Massachusetts, and North Andover, Massachusetts.... This obligation shall extend to any deliveries of such Committed Waste by private haulers where the AUTHORITY or SCRRA have contracts with municipalities requiring the delivery of all waste within those municipalities....

The AUTHORITY shall not accept and shall in fact reject deliveries of any waste known to the AUTHORITY to be committed to projects operated by [the Wheelabrator defendants] by written agreement with any Connecticut municipality.... This obligation shall extend to any deliveries of such ... waste by private haulers where [the Wheelabrator defendants] have contracts with municipalities requiring the delivery of all waste within those municipalities ...

B. Notification to Reject Waste. If the AUTHORITY notifies ... [Wheelabrator] at any time that it reasonably believes ... that an identified hauler or one or more of its Affiliates is delivering Committed Waste to any [Wheelabrator] facility, then [Wheelabrator] shall refuse to accept such delivery of waste from such hauler or its Affiliate.... If on three occasions in any three-month period the AUTHORITY so identifies a hauler or its Affiliates delivering Committed Waste to any [Wheelabrator] Facility, and the identified deliveries are not so certified by an independent person, or if on three occasions in any three-month period, the AUTHORITY provides reasonable evidence that waste from a transfer station that has accepted Committed Waste has been delivered to a [Wheelabrator] Facility, then [Wheelabrator] shall refuse to accept any and all deliveries from such hauler and its Affiliates or from such transfer station, as the case may be, for a period of no less than three months.[5]

Thus, the settlement agreement requires both CRRA and the Wheelabrator defendants to respect one another's municipal contracts by rejecting deliveries of any waste committed to one another. In addition, if a hauler delivers waste to Wheelabrator facilities three times within a three-month period when that waste is committed to CRRA, the Wheelabrator defendants must refuse all deliveries of waste from that hauler for the next three months. Put simply, the settlement agreement bars both parties from accepting diverted waste, and requires the Wheelabrator defendants to shun haulers for three months if they divert committed waste.

In exchange for the agreement, CRRA took steps to withdraw its legal action against the permitting of the Lisbon facility, and agreed that it would take no action to re-enter or re-institute the same or similar proceedings in the future. See Settlement Agreement, Art. VII; *Connecticut Resources Recovery Authority v. Commissioner of the Department of Environmental Protection*, 1995 WL 548711 at *2 (Conn.Super.Sept.7, 1995) (noting July 31, 1995 filing of stipulation consenting to dismissal of CRRA's appeal from the DEP decision to permit the opening of the Lisbon facility). CRRA also agreed to "take no further action which reasonably could be construed as opposing the permitting, construction or operation of the Lisbon Facility," and to urge other parties engaged in litigation opposing the permitting to similarly withdraw their opposition. Settlement Agreement, Art. VII(C). Moreover, CRRA agreed to join Wheelabrator in seeking the permit, and to urge the other parties to do the same. *Id.*

On May 3, 1996, plaintiffs, ten affiliated waste hauling companies, were notified that they were being "locked out" of the Wheelabrator defendants' facilities pursuant to the settlement agreement, for attempting three times within a three-month period to deliver waste to Wheelabrator facilities when that waste had been committed to CRRA. On May 6, 1996, roughly ten months after the settlement agreement was signed, plaintiffs

---

**5.** The "SCRRA" to which the settlement agreement refers is the Southeastern Connecticut Regional Resources Recovery Authority, a regional resources recovery facility comprised of the towns of East Lyme, Griswold, Groton, Ledyard, Montville, New London, North Stonington, Norwich, Sprague. Stonington, and Waterford.

filed an action against the Wheelabrator defendants in the District of Connecticut, alleging that the settlement agreement violated the antitrust laws. The district court entered an *ex parte* temporary restraining order, enjoining the defendants from carrying out the agreement, and scheduled a hearing on an order to show cause for May 13, 1996. On that date, CRRA was permitted to intervene in the action as a defendant. Plaintiffs amended their complaint on May 17, 1996, adding a claim that the settlement agreement violated the Commerce Clause on the ground that it "unreasonably restrain[ed] free trade and interstate commerce." Amended Complaint ¶ 13(h). On August 30, 1996, the complaint was dismissed on the grounds that, even if the settlement agreement was anticompetitive, it was exempt from the Sherman Act under the state action immunity doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and because it did not discriminate against or unduly burden interstate commerce.

## Discussion

We review the grant of a motion under Fed.R.Civ.P. 12(b)(6) de novo, and must construe in plaintiffs' favor factual allegations in the complaint. *Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991). Our consideration, like the district court's, is limited to facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint by reference, as well as to matters of which judicial notice may be taken. *Id.* Dismissal of the complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted).

### A. The Antitrust Cause of Action

Plaintiffs claim that CRRA "developed and maintained a vast system of [waste-to-energy] solid waste management projects, under a Solid Waste Management Plan" that "virtually eliminated" landfilling in favor of waste-to-energy disposal. Amended Complaint ¶ 7.

This has allegedly given CRRA a "virtual monopoly over waste incineration and disposal in the State of Connecticut." *Id.* ¶ 10. Plaintiffs further allege that CRRA and the Wheelabrator defendants then engaged in a "*per se* Sherman Act violation," by conspiring to maintain the CRRA monopoly via a "total lock-out," or boycott, of the plaintiffs' business "to enforce flow-control contracts between municipalities and CRRA against private haulers ... [who] were not parties to or bound by those contracts." Brief of Plaintiffs–Appellants at 10, 17; Amended Complaint ¶ 15.

CRRA's "virtual monopoly" over waste disposal is the result of the Connecticut General Assembly's decision, discussed above, to phase out landfills in favor of more environmentally friendly waste-to-energy disposal. Connecticut's Solid Waste Management Plan, which promoted this monopoly, was promulgated not by CRRA, but by Connecticut's Department of Environmental Protection. Indeed, federal law tightened the grip of this "virtual monopoly," by further requiring Connecticut to abandon its landfill system. *See* 40 C.F.R. pt. 258 (1998) (detailing stricter environmental standards for landfills); Legislative Report at 7 ("One RCRA provision that is having a significant impact on waste management methods in Connecticut and other states requires that landfills meet stricter environmental protection standards or close by October 1, 1993.... A number of landfills, particularly those owned by municipalities, are planning to close rather than institute costly improvements and operating procedures required by RCRA.").

Plaintiffs acknowledge that the source of the monopoly CRRA allegedly enjoys is the Solid Waste Disposal Plan adopted by the DEP pursuant to a legislative directive. Specifically, paragraph seven of the Amended Complaint alleges that

CRRA has developed and maintained a vast system of solid waste management projects, *under a Solid Waste Management Plan*, which include waste-to-energy plants and transfer stations. This Plan has abandoned landfilling in favor of transporting waste ... to trash-to-energy plants for ultimate disposal. By doing so,

*this Plan has virtually eliminated every available solid waste disposal site in the State of Connecticut in favor of trash-to-energy plaints* [sic].

Indeed, the basis of the complaint is not the alleged monopoly, but the settlement agreement to boycott committed waste. *See id.* ¶ 11.

While plaintiffs allege that this agreement "further tightened the grip" of this monopoly, Plaintiffs' Amended Complaint ¶ 10, it does this, according to plaintiffs' own characterization, merely to ensure that CRRA receives the benefit of the municipal waste disposal contracts that CRRA had lawfully acquired. Brief of Plaintiffs–Appellants at 17 (arguing that CRRA entered into the agreement with the Wheelabrator defendants "to enforce flow-control contracts between municipalities and CRRA").

The defendants' motion to dismiss the antitrust cause of action relied solely on the state action immunity defense and did not challenge the complaint on the ground that it was otherwise insufficient to allege a violation of the Sherman Antitrust Act. Under these circumstances, we too assume the sufficiency of the antitrust cause of action, and follow the practice of deciding the state action immunity defense ahead of the substantive antitrust issue. *See* 1 P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 224, at 407 (1997).

### 1. The State Action Immunity Defense

In *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court first articulated what has become known as the state action defense to the Sherman Act. We need not examine here the entire gloss that the Supreme Court has added to the *Parker* doctrine over the last 55 years. Indeed, we need go no further than the Supreme Court's holding in *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978). That case involved Sherman Act claims by and against two electric utility systems operating in Louisiana. The plaintiffs were two cities organized under the laws of the State of Louisiana, which granted them power to own and operate electric utility systems both within and beyond their city limits. The

defendants were competitors who filed Sherman Act cross-claims against the two cities, referred to here as the municipal defendants. The latter, invoking the *Parker* doctrine, moved to dismiss the cross-claims.

The Supreme Court rejected the claim that the municipal defendants were state actors whose anticompetitive conduct was exempt from the Sherman Act, although they did enjoy what may loosely be described as a qualified exemption. Specifically, as Justice Brennan observed, "the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *City of Lafayette,* 435 U.S. at 413, 98 S.Ct. 1123.

In explaining why municipalities operating a public utility enjoyed immunity only if they acted pursuant to such state policies, Justice Brennan observed that the state action doctrine proceeded from the premise that given our "dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 421, 98 S.Ct. 1123 (quoting *Parker,* 317 U.S. at 351, 63 S.Ct. 307). This policy of deference did not apply to municipalities as a general matter because "[c]ities are not themselves sovereign" and "have not been treated as equivalents of the States themselves." *Id.* at 412, 63 S.Ct. 307.

Moreover, it could not be assumed that actions taken by municipalities "with substantially less than statewide jurisdiction" necessarily reflected state policy. *Id.* at 414, 63 S.Ct. 307. "When cities, each of the same status under state law, are equally free to approach a policy decision in their own way, the anticompetitive restraints adopted as policy by any one of them, may express its own preference, rather than that of the State. . . . To permit municipalities to be shielded from the antitrust laws in such circumstances would impair the goals Congress sought to achieve by those laws . . . without furthering

the policy underlying the *Parker* 'exemption.'" *Id.* at 414–15, 63 S.Ct. 307.

These concerns required that municipalities satisfy a more stringent test in order to invoke *Parker* immunity for their anticompetitive behavior. *Id.* at 415, 63 S.Ct. 307. Nevertheless, Justice Brennan explained that "[t]his does not mean ... that a political subdivision necessarily must be able to point to a specific, detailed legislative authorization before it properly may assert a *Parker* defense to an antitrust suit." *Id.*[6] Instead, Justice Brennan articulated a foreseeability standard, holding that "an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found 'from the authority given a governmental entity to operate in a particular area, that the [state] legislature contemplated the kind of action complained of.'" *Id.* (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 532 F.2d 431, 434 (5th Cir.1976)). *See* Phillip Areeda, *Antitrust Immunity for "State Action" after Lafayette*, 95 Harv. L.Rev. 435, 445–46 (1981).

Subsequent cases would refer to *City of Lafayette* as requiring a "clearly articulated and affirmatively expressed policy" to displace competition. *See, e.g., New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 109, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (citing *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. 1123); *California Retail Liquor Dealers Assoc. v. Midcal Aluminum*, 445 U.S. 97, 104, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (same). In the passage cited by these cases, Justice Brennan used this phrase to discuss the scheme at issue in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), an earlier Supreme Court case, rather than to set the standard for applying the state action exemption to anticompetitive acts by municipal market participants. *City of Lafayette*, 435 U.S. at

410, 98 S.Ct. 1123. Nevertheless, the "clear articulation" label is not quite the hurdle that its language suggests, because it has always been construed as synonymous with the foreseeability test articulated above. *See, e.g., City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 372–73, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.*, 790 F.2d 1032, 1042 (2d Cir. 1986) ("The [Supreme] Court thus indicated the test should be one of foreseeability— whether the legislature could foresee the anticompetitive effects that would follow from the express authority the state had delegated to its cities.").

■ More significantly, however it is labeled, the *City of Lafayette* test does not apply to anticompetitive actions undertaken by a State rather than a municipality. On the contrary, it is clear that, if the State of Louisiana, rather than two of its municipalities, had operated the electric utility systems, it would have enjoyed an unqualified exemption from the antitrust laws. *See Cine 42nd Street*, 790 F.2d at 1042; *Limeco, Inc. v. Division of Lime*, 778 F.2d 1086 (5th Cir. 1985). Indeed, four Justices in *City of Lafayette* argued that even the municipalities enjoyed such immunity. *See City of Lafayette*, 435 U.S. at 427–41, 98 S.Ct. 1123 (Stewart, J., dissenting).[7]

### 2. CRRA's Status for *Parker* Immunity Purposes

CRRA is "a body politic and corporate, constituting a public instrumentality and political subdivision of the state of Connecticut established and created for the performance of an essential public and governmental function." Conn.Gen.Stat. § 22a–261(a). The

---

6. Contrary to plaintiffs' arguments, *see* Brief of Plaintiffs–Appellants at 13–14, the Supreme Court reaffirmed this standard in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 44, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) ("[R]equiring such explicit authorization by the State might have deleterious and unnecessary consequences.").

7. Only Chief Justice Burger would have required municipalities engaged in proprietary activities

to show more than the state authorization required by the *City of Lafayette plurality. See City of Lafayette*, 435 U.S. at 425 n. 6, 98 S.Ct. 1123 (Burger, C.J., concurring). Nevertheless, he joined the plurality's judgment and the directions of the remand, "because they represent at a minimum what [the Chief Justice believed] we should demand of petitioners." *Id.* at 426 n. 6, 98 S.Ct. 1123.

General Assembly has conferred upon CRRA the power of eminent domain, bonding authority, and tax exempt status, Conn.Gen. Stat. §§ 22a–269, 22a–270, 22a–276, and vested in it "all power necessary" to carry out its legislatively mandated responsibilities. Conn.Gen.Stat. § 22a–262. The status of such entities was not directly addressed in *City of Lafayette*. Nevertheless, there are compelling reasons for concluding that CRRA should be treated as the State itself rather than as a municipality.

Unlike the Cities of Lafayette and Plaquemine, which had "substantially less than statewide jurisdiction," *City of Lafayette*, 435 U.S. at 414, 98 S.Ct. 1123, CRRA was created to implement a uniform statewide waste disposal policy. As the Supreme Court of Connecticut observed, after summarizing the legislative scheme creating CRRA that we have already canvassed:

> These statutes evidence a legislative intent to commit the difficult regional problems of solid waste disposal to regional and statewide solution. *The legislature could reasonably have determined that only a decision-making body with a mandate to consider the needs of more than one community could adequately balance the competing concerns of various localities within the state.* Local zoning regulations ... which operate to exclude the facilities that the CRRA has found necessary, and the DEP has found environmentally acceptable, frustrate the explicit purposes of the state statutes and are therefore preempted.

*Shelton v. Commissioner of the Department of Environmental Protection*, 193 Conn. 506, 518, 479 A.2d 208, 215 (1984) (emphasis added). This is the antithesis of the scheme in *City of Lafayette* which left "cities, *each of the same status under state law,* ... equally free to approach a policy decision in their own way" without any indication that the anticompetitive restraints adopted as policy reflected the State's preferences rather than those of the municipalities. *City of Lafayette*, 435 U.S. at 414, 98 S.Ct. 1123 (emphasis added).

CRRA is not only a statewide entity that "undertakes state functions," it is "politically accountable to the State, and by extension, to the electorate." *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 61, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (O'Connor, J., dissenting). As Justice O'Connor continued in *Hess:*

> The critical inquiry, then, should be whether and to what extent the elected state government exercises oversight over the entity. If the lines of oversight are clear and substantial—for example, if the State appoints and removes an entity's governing personnel and retains veto or approval power over an entity's undertakings—then the entity should be deemed an arm of the State for Eleventh Amendment purposes.

*Id.* See also 1 P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 224, at 411 (1997) ("Presumptively, we would reserve the 'state itself' designation only for government agencies that are *both* statewide in their jurisdiction and have no particular susceptibility to capture by a particular business group.") (emphasis in original).

 The issue in *Hess* was whether a bi-state agency was an arm of the State for Eleventh Amendment purposes. The Supreme Court, dividing five to four, held that the decisive factor in determining the agency's status should be the impact of any adverse judgment on the State's treasury, rather than the control exercised by the elected state government. Justice O'Connor's discussion of the latter issue is helpful here, because the degree of control exercised by the State is a critical factor in determining whether the conduct of a state agency is that of "the State itself" for the purposes of the *Parker doctrine*. *Cine 42nd Street*, 790 F.2d at 1044.

Here, CRRA's 13–member board of directors now includes the Commissioners of Transportation and Economic Development, the Secretary of the Office of Policy and Management, four gubernatorial appointees, and six legislative appointees (who may themselves be members of the general assembly). Conn.Gen.Stat. § 22a–261(b). Two of the gubernatorial appointees must be first selectmen, mayors, or managers from Connecticut municipalities, and the other two must be "public members." Conn.Gen.Stat.

§ 22a–261(c). The chairman serves at the pleasure of the Governor, *id.,* and any board member may be removed by the Governor "for inefficiency, neglect of duty or misconduct in office." Conn.Gen.Stat. § 22a–261(k).

More significantly, CRRA is not simply a statewide agency making policy on its own. Rather, it is a "creature of the General Assembly" of Connecticut, and "the mechanism of carrying out the concept of a state-wide plan of dealing with solid waste." H. Rep. Tr. at 6673 (comments of Rep. Ratchford); Sen. Tr. at 3754 (remarks of Sen. Costello). The Solid Waste Management Plan— CRRA's basic charter—is promulgated by the Commissioner of Environmental Protection, who must also approve CRRA's annual plan of operations. Conn.Gen.Stat. § 22a–264. Indeed, the Commissioner was actually a member of CRRA's board until 1989, when the General Assembly recognized that, because "the role of CRRA change[d] from developer to operator, the Department's regulatory role ha[d] become more significant and must be perceived to be fully independent." *See* Conn. Joint Standing Committee Hearings, Environment, 1989 Sess., p. 2680 (testimony of Leslie Carothers, Commissioner of Environmental Protection).

In contrast to *Cine 42nd Street,* where we held that New York's Urban Development Corporation ("UDC") "cannot claim that it is the state," because it had "nearly absolute operational autonomy," and because a "high level of participation by the state [was] missing," *Cine 42nd Street,* 790 F.2d at 1036, 1044 & n. 3, the opposite is true here. While CRRA, like the UDC, has the authority to operate free of the bureaucratic red tape that binds most state agencies, *see Shelton,* 193 Conn. at 511–15, 479 A.2d at 211–13,[8] it lacks "absolute operational autonomy." Instead, its operation is subject to regulation by the Commissioner of Environmental Protection. *See Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 1996 WL 601997, *5 (Conn.Super. Oct. 8, 1996) (rejecting challenge by plaintiffs to the CRRA–Wheelabrator settlement agreement at issue here under the Connecticut Unfair Trade Practices Act, because "CRRA's plan of operation is administered by the commissioner of environmental protection").

Under these circumstances, there is a basis for suggesting that its acts should be considered acts of the State of Connecticut, and that the settlement agreement should be exempt from the antitrust laws, without a further finding that the settlement agreement was contemplated by the Connecticut General Assembly "from the authority given [CRRA] to operate in a particular area." *City of Lafayette,* 435 U.S. at 415, 98 S.Ct. 1123. We do not, however, decide the case on the ground that CRRA is itself the State of Connecticut, and leave this question open. If CRRA is not the State itself, it is at least a political subdivision of Connecticut, and its alleged anticompetitive behavior is exempt under the *City of Lafayette* foreseeability standard, either as we "generously" applied that standard to the UDC, or under a more rigorous analysis that Judge Newman suggested would be applied if the anticompetitive conduct there was engaged in by a municipality. *Cine 42nd Street,* 790 F.2d at 1049 (Newman, J., concurring).

### 3. Authorization of the Settlement Agreement

■ The "anticompetitive conduct" alleged here is an agreement that ensures that CRRA will receive the waste that is committed to it pursuant to long-term contracts with the municipalities it services. CRRA was authorized to enter into these long-term contracts, and they are vital to carrying out CRRA's mandate to conduct its resource recovery operations in a manner "sufficient to provide for the support of the authority and its operations on a self-sustaining basis." Conn.Gen.Stat. § 22a–262(2). While the Connecticut General Assembly may not have had the precise terms of this settlement agreement in mind, it is not precluded by the

---

8. CRRA was given this freedom in 1984 when the General Assembly amended Conn.Gen.Stat. § 22a–261(a) to provide that CRRA "shall not be construed to be a department, institution or agency of the state." The purpose of this language was to codify case law holding that CRRA was not a state agency subject to Connecticut's Uniform Administrative Procedure Act. *See Shelton,* 193 Conn. at 514–15, 479 A.2d at 213.

legislative mandate CRRA was given, and it is a reasonably foreseeable consequence of CRRA's specific direction to operate a financially solvent waste-to-energy system. As the Court of Appeals for the Eighth Circuit observed in a closely analogous case:

> We believe that the Iowa legislature did indeed contemplate these restrictions on competition. Chapter 28F expressly authorizes municipalities to finance collective projects by issuing revenue bonds. When ascertaining what was in the minds of the legislators, we cannot ignore the realities of the municipal bond market in the mid 1970's. The legislature surely realized the importance of assuring a source of repayment in order to make the bonds marketable. Common sense and experience suggest that the Iowa legislature must have intended Metro to have the latitude necessary to impose restrictions on competition if Metro believed such restrictions necessary to promote the sale of the bonds. The bond experts had convinced Metro that the restrictions were essential for marketing the bonds. In short, even though the legislation does not speak to the precise question whether restraints of trade could be employed to guarantee the financial vitality of Metro, the comprehensive legislative scheme favoring the development of solid waste facilities demonstrates that the legislature intended the localities to have broad authority to act in furtherance of the legislative mandate. Thus, we believe that the restraint on competition was a "necessary or reasonable consequence" of engaging in the authorized activity of constructing a waste disposal facility with funds raised by revenue bonds.

*Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419, 427 (8th Cir.1983), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985) (footnote omitted).

The *Central Iowa* analysis is equally applicable here, and is consistent with our own holding in *Cine 42nd Street,* 790 F.2d at 1044–46. The present case, however, is far stronger than *Central Iowa* or *Cine 42nd Street,* because there is a clearly articulated policy of the State of Connecticut to limit competition in the waste-to-energy market in order to protect CRRA's financial integrity.

There is ample evidence, which we have already detailed, that the State of Connecticut intended to replace failing (and illegal) landfills with a state-mandated system coordinated by CRRA. At the very least, the General Assembly contemplated CRRA's potential to displace competition when it passed the implementing legislation over objections that CRRA would simply condemn all of its private competitors. More significantly, the General Assembly's willingness to supplant competition is explicit in its subsequent decision to forbid the construction or expansion of disposal facilities that would create an excess capacity, or demand, for municipal solid waste. Specifically, Conn.Gen.Stat. § 22a–208d(a) requires that "the Commissioner of Environmental Protection shall not issue a permit under section 22a–208a to construct or expand a resources recovery facility ... unless said commissioner makes a written determination that such facility ... is necessary to meet the solid waste disposal needs of the state and will not result in substantial excess capacity of resources recovery facilities." Section 208d(c)(1)(I) similarly requires "[a] demonstration that the throughput capacity of the proposed facility, when combined with the throughput capacity of all other resources recovery facilities ..., shall not exceed the total throughput capacity of resources recovery facilities ... needed to process waste generated in the state."

One of the purposes, although not the only purpose, of the certificate of need requirement was concern over the consequences of overbuilding. As Representative Mushinsky, the Chairman of the Environmental Committee, explained in defending the original certification of need legislation that was enacted in 1987:

> [O]ver-building of Resource Recovery Plants[,] which are very expensive to back financially, may cause some plants to be under capacity, and that would cause them to fail financially. It is in the State's best interest not to have any of these plants fail, so we don't wind up being the ... payer of debt of last resort. It is up to the

State to build wisely and not overdo it, so that all these plants make it financially. 30 (H–463) H.R. Proceedings, Pt. 14, 1987 Sess., p. 5094; *see also id.* at 5084 (explaining that proposed plant would be denied a certificate of need if it would create overcapacity that would result in "stealing waste from other plants, which then put those plants under capacity"); 30 (H–472) H.R. Proceedings, Pt. 23, 1987 Sess., p. 8381 (explaining that related language in former Conn.Gen. Stat. § 22a–208a was intended to accomplish similar purpose, and to permit plants to serve only Connecticut's needs).

Moreover, in the very case that gave rise to the settlement agreement, Justice David M. Shea, a retired Justice of the Supreme Court of Connecticut, relied on § 22a–208a in holding that CRRA had standing to challenge the DEP decision to permit the Lisbon facility:

> One of the purposes the legislators probably had in mind in directing the commissioner to consider the capacity of existing [solid waste resources recovery] facilities when making a determination of need was the financial impact of a new competitor for municipal waste, because the state has a significant interest in maintaining the financial viability of these [solid waste resources recovery] facilities operated by CRRA. . . .

*Connecticut Resources Recovery Authority v. Commissioner of the Department of Environmental Protection*, 1994 WL 60061, at *4 (Conn.Super. Feb. 16, 1994), *appeal dismissed*, 233 Conn. 486, 659 A.2d 714 (1995). *See also* Legislative Report at 60 (criticizing decision to permit Lisbon facility and recommending "five-year moratorium on making a written determination of need for a resources recovery facility as provided under C.G.S. §§ 22a–208d").[9]

Rather than stifling competition by denying a permit to open the Lisbon facility,

however, the settlement agreement merely conditions the opening on Wheelabrator's agreement not to compete for CRRA's contractually committed waste supply. Of course, as plaintiffs argue, the Commissioner of Environmental Protection did not condition the Lisbon permit on Wheelabrator's agreement not to compete for waste contractually committed to CRRA. Nevertheless, CRRA had independent standing to sue to enforce § 22a–208d, and the settlement agreement gave relief that, if otherwise impermissibly anticompetitive, was simply of a lesser magnitude than that explicitly contemplated by the General Assembly.

In the face of this compelling case for the application of the *Parker* doctrine, plaintiffs rely on language in *Federal Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 636, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992), suggesting that "state-action immunity is disfavored," and essentially ask us to ignore binding Supreme Court and Second Circuit precedent. A careful reading of *Ticor* shows that neither its holding nor its cautionary language applies to the present case. *Ticor* was a private price-fixing case which revolved around the degree of active state supervision that was required to justify such anticompetitive behavior by private parties. *See California Retail Liquor Dealers Assoc. v. Midcal Aluminum*, 445 U.S. 97, 104–05, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). Indeed, the Federal Trade Commission had conceded that the challenged conduct was foreseeable and contested only the adequacy of the "state participation in the ratesetting scheme." *Ticor*, 504 U.S. at 639, 112 S.Ct. 2169. Such participation "by governmental actors" was necessary to ensure "that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Id.* at 634–35, 112 S.Ct. 2169.

---

**9.** The Lisbon facility itself may have been an issue at the time the certificate of need requirement was first enacted. Richard Adams, who testified against the legislation on behalf of Regional Disposal Systems, Inc., defended the Lisbon proposal against what he perceived as a possible concern that it would process out-of-state waste. Conn. Joint Standing Committee

Hearings, Environment, Pt. 2, 1987 Sess., p. 497. Mr. Adams also argued that excess capacity "wouldn't necessarily be a bad idea," because it "might generate some actual competition for tipping fees in Connecticut, reducing the cost to the communities and the industries that are looking to dispose of solid waste." *Id.* at 498.

More significantly, the Supreme Court expressly limited its holding in *Ticor* to private "horizontal price fixing under a vague *imprimatur* in form and agency inaction in fact." *Id.* at 639, 112 S.Ct. 2169. After observing that "[n]o antitrust offense is more pernicious than price fixing," the Supreme Court concluded:

> Our decision should be read in light of the gravity of the antitrust offense, the involvement of private actors throughout, and the clear absence of state supervision. We do not imply that some particular form of state or local regulation is required to achieve ends other than the establishment of uniform prices.

*Id.*

*Ticor* has no relevance here: the present case does not involve price fixing. Nor is the close supervision test applied in *Ticor* applicable to state agency conduct. *Cine 42nd Street*, 790 F.2d at 1047 (citing *Hallie*, 105 S.Ct. at 1720 n. 10). This case is, therefore, an easy one in every respect. There is a compelling argument that CRRA should be treated in the same way as the State of Connecticut for the purposes of the *Parker* doctrine. More significantly, the settlement agreement meets the "broad test of forseeability [sic]" that plaintiffs acknowledge was adopted in *Cine 42nd Street*, and which their argument would require us to overrule. Brief of Plaintiffs–Appellants at 26. Indeed, even under a foreseeability standard far more narrow than these cases require, the alleged anticompetitive conduct was simply conduct of a lesser magnitude than that authorized by the General Assembly.

Accordingly, the settlement agreement into which CRRA entered with Wheelabrator does not subject it to liability under the Sherman Act. Moreover, our conclusion that CRRA can avail itself of the *Parker* doctrine also compels the conclusion that the Wheelabrator defendants are shielded from antitrust liability. Subjecting them to antitrust liability would effectively block CRRA's efforts to carry out its mandate through contracts with private parties. *See Cine 42nd Street*, 790 F.2d at 1048 (holding that "private appellees acting in concert with the UDC are also entitled to state immunity. . . .

[A]llowing successful tangential attacks on the UDC's activities through suits against the third parties would effectively block the efforts of the UDC."). *See also Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985).

## B. The Commerce Clause Cause of Action

 The Commerce Clause provides that "Congress shall have the Power ... to regulate Commerce with foreign nations and among the several States." U.S. Const. Art. I, § 8, cl. 3. A "dormant" or "negative" aspect of this grant of power is that a State's power to impinge on interstate commerce is limited. *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). The processing and disposal of solid waste is "commerce" under the Commerce Clause. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

 The Supreme Court has held that the first step in analyzing any law subject to judicial scrutiny under the dormant Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Hughes*, 441 U.S. at 336, 99 S.Ct. 1727. In this context, " 'discrimination' ... means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). If a restriction on commerce is discriminatory, it may be applied only if it is "demonstrably justified by a valid factor unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). In contrast, nondiscriminatory regulations that have only "incidental" effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397

U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

■ "We have explained that the 'incidental burdens' to which *Pike* refers 'are the burdens on interstate commerce that exceed the burdens on intrastate commerce.'" *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 75 (2d Cir.1996) (quoting *USA Recycling v. Town of Babylon,* 66 F.3d 1272, 1287 (2d Cir.1995), *cert. denied,* 517 U.S. 1150, 116 S.Ct. 1452, 134 L.Ed.2d 571 (1996)); *New York State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1308 (2d Cir.1994). Where a regulation does not have this disparate impact on interstate commerce, then "we must conclude that ... [it] has not imposed any 'incidental burdens' on interstate commerce that 'are clearly excessive in relation to the putative local benefits.'" *USA Recycling,* 66 F.3d at 1288 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844). Thus, the minimum showing required to succeed in a Commerce Clause challenge to a state regulation is that it have a disparate impact on interstate commerce. The fact that it may otherwise affect commerce is not sufficient. *Id.* at 1287 (rejecting Commerce Clause challenge to Town of Babylon's takeover of local garbage market notwithstanding "relatively minor effects on both interstate and local commerce," because it did "not impose any different burdens on nonlocal as opposed to local garbage haulers"). *See also National Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1131 (7th Cir.1995) (Easterbrook, J.), *cert. denied,* 515 U.S. 1143, 115 S.Ct. 2579, 132 L.Ed.2d 829 (1995).

■ Plaintiffs' Commerce Clause cause of action fails for several reasons. Plaintiffs' claim appears to be a vaguely pleaded effort to invoke the Supreme Court's holding in *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), that an ordinance that deprives out-of-state businesses access to a local market for the processing of garbage "discriminates against interstate commerce." In reaching this conclusion, the Supreme Court observed that "what makes garbage a profitable business is not its own worth but the fact that its possessor must pay to get rid of it. In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *Carbone,* 511 U.S. at 390–91, 114 S.Ct. 1677. The Clarkstown ordinance discriminated with respect to this stream of commerce because "it allow[ed] only the favored operator to process waste that [was] within the limits of the town." *Id.* at 391, 114 S.Ct. 1677. The fatal flaw of the ordinance—like those the Supreme Court had previously struck down—was that it "hoard[ed] a local resource ... for the benefit of local businesses that treat[ed] it." *Id.* at 392, 114 S.Ct. 1677. Specifically, it "hoard[ed] solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility." *Id.*

This case is not *Carbone.* The settlement agreement does not prevent out-of-state waste processors from operating in Connecticut or from accepting waste generated there. Nor is the complaint about the differential treatment of in-state and out-of-state waste haulers. Plaintiffs concede here that the agreement does not facially discriminate against interstate commerce. Brief of Plaintiffs–Appellants at 35. While they argue that the settlement agreement has the practical effect of doing so, this argument cannot survive careful scrutiny. The status quo ante, which plaintiffs seek to have restored by enjoining enforcement of the settlement agreement, was one in which waste produced in Connecticut was processed in Connecticut. The local waste would remain in-state because the overcapacity in Connecticut created such a competitive spot market that it actually attracted significant waste from out-of-state producers, Legislative Report at 17 ("[A]bout one half ... of the 651,000 tons of spot waste delivered to CRRA facilities in FY 93 came from generators located outside of Connecticut."), and because waste-to-energy plants located in Connecticut are inherently more attractive for Connecticut waste haulers, who do not have to incur additional transportation costs and delay. *See* Reply Brief of Plaintiffs–Appellants at 21 n. 10.

Under these circumstances, it is not surprising that the specific damage plaintiffs allege they suffered as a result of the settlement agreement is that they "hav[e] been

forced to travel longer distances, expend additional and unnecessary wear and tear on their vehicles, pay additional wages and overtime, devote substantial efforts to reroute their trucks, suffer delay and harassment, and pay higher prices for waste disposal" than they otherwise would have incurred. Amended Complaint ¶ 14.

Plaintiffs do not allege that, but for the settlement agreement, they would haul waste to processors out-of-state. On the contrary, they expressly disclaim any desire to do so. Reply Brief of Plaintiffs–Appellants at 21 n. 10 ("Article VI [of the settlement agreement] presents plaintiffs with an anticompetitive ultimatum: deliver as CRRA chooses in Connecticut, or incur increased travel costs transporting waste out of state."). Indeed, the equitable relief plaintiffs seek is simply the freedom to deliver waste as they choose inside Connecticut, rather than the freedom to push it into the stream of interstate commerce.

Thus, the practical effect of the settlement agreement, as plaintiffs' complaint and arguments here confirm, is to control the intrastate flow of a particular segment of waste generated in Connecticut between CRRA and the Wheelabrator defendants (who are incorporated in Delaware and have their principal place of business in New Hampshire). This particular segment of waste is committed to them by contracts for which out-of-state processors could have bid. Like the automobile hulks in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976), the in-state processing of which was subsidized by the State of Maryland, the waste generated in Connecticut remains in Connecticut "in response to market forces." *Id.* at 810, 96 S.Ct. 2488.

We do not suggest that the settlement agreement may not have some effect on interstate commerce. Specifically, the Wheelabrator defendants not only agreed to refuse committed waste at their Connecticut facilities, but also agreed to refuse committed waste at their inconveniently located waste-to-energy plants in Peekskill, New York (on the Hudson River), Millbury, Massachusetts (near Worcester), and Andover, Massachusetts (near New Hampshire). The Wheelab-rator defendants also agreed to turn away for a three-month period all waste delivered, whether it is committed or not, by haulers who attempted to deliver committed waste three times in the preceding three months.

The provision requiring the three-month exclusion of uncommitted waste at Wheelabrator's three out-of-state facilities does not appear to be of any practical consequence, because the settlement agreement does not restrict plaintiffs from depositing this waste at the spot market rate in four of the six waste-to-energy plants inside Connecticut. Under the circumstances, it would be counter to plaintiffs' expressed economic interest to incur the additional expense of hauling uncommitted waste to distant locations outside of Connecticut.

Nevertheless, there is one scenario in which Wheelabrator's agreement to turn *committed* waste away from its three out-of-state facilities would affect interstate commerce. If Wheelabrator only turned plaintiffs away from its Connecticut facilities, it is possible that plaintiffs could profitably dispose of the committed Connecticut waste at Wheelabrator's out-of-state facilities, albeit at a smaller profit. The claim that this constitutes an "incidental" burden on interstate commerce sufficient to invoke the *Pike* balancing standard, however, ignores the reason why plaintiffs would have any reason to haul committed waste outside of Connecticut for processing.

Plaintiffs remain free to deposit committed waste at CRRA and Wheelabrator waste-to-energy facilities in Connecticut by paying the contractually arranged tipping fees. Indeed, even during the three-month "penalty period" during which Wheelabrator is obligated to turn away even waste contractually committed to itself, plaintiffs concede that four of the six trash-to-energy facilities in Connecticut remain available to them, although they would be forced to "pay CRRA's above-market prices for *all* its waste for that time, or close their doors." Brief of Plaintiffs–Appellants at 7 (emphasis in original). The need, if any, to haul waste outside of Connecticut derives from plaintiffs' desire to obtain cheaper tipping fees than those available in

Connecticut because of the settlement agreement.

The settlement agreement may very well affect commerce if it forces plaintiffs to haul committed waste from Connecticut to out-of-state processors. Nevertheless, because it cannot be said that "the flow of interstate commerce will be reduced, and thereby burdened," *USA Recycling,* 66 F.3d at 1287, the settlement agreement "has not imposed any 'incidental burdens' on interstate commerce that 'are clearly excessive in relation to the putative local benefits.'" *Id.* at 1288 (quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844). On the contrary, assuming that plaintiffs can still earn a profit by hauling committed waste for processing outside of Connecticut, the net effect of the settlement agreement is to increase the use of out-of-state processors for committed waste, even if three of Wheelabrator's out-of-state facilities will be closed to plaintiffs.[10] Indeed, this is presumably what plaintiffs have been doing since the settlement agreement was executed. *See* Amended Complaint ¶ 14.

Moreover, even if the settlement agreement did have an "incidental effect" on interstate commerce, it is doubtful that plaintiffs could show that the burden on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. Here, the putative local benefit is the preservation of CRRA's interest in "the security and integrity of contractual relations" into which it has entered with local municipalities. 2 Fowler V. Harper, Fleming James, Jr. & Oscar S. Gray, THE LAW OF TORTS § 6.5, at 302 (2d ed.1986). Indeed, the particular contracts at issue here are sufficiently critical to the operation of an effective solid waste disposal system that Congress has specifically provided that "no State or local government within the State shall be prohibited under State or local law" from entering into them. 42 U.S.C. § 6943(a)(5).

On the other side of the scale, plaintiffs have not alleged or suggested facts that es-tablish that any incidental effect that the settlement agreement may have on interstate commerce is excessive in relation to the benefit achieved. Instead, their only argument with respect to the *Pike* standard is that the settlement agreement is unreasonable because plaintiffs are not parties to the municipal contracts that CRRA seeks to keep free from plaintiffs' interference. Brief of Plaintiffs–Appellants at 40–41. This argument confuses the burden of the settlement agreement on plaintiffs with a burden on interstate commerce. *Cf. Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 126, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."). Since any effort to prevent a third party from interfering with a contract must be directed at that third party, the settlement agreement is not invalid solely for that reason, even if it affects interstate commerce. In sum, as Judge Easterbrook recently put it: "No disparate treatment, no disparate impact, no problem under the dormant commerce clause." *National Paint & Coatings,* 45 F.3d at 1132.

■ Nor is the settlement agreement invalid *per se* "because it has the practical effect of regulating commerce occurring wholly outside" the borders of the State of Connecticut. Brief of Plaintiffs–Appellants at 36. The Commerce Clause "precludes the application of a *state statute* to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.,* 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) (emphasis added). As the Supreme Court continued in *Edgar:*

> The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, "any attempt 'directly' to assert extraterritorial jurisdiction over persons or property would offend sister

---

**10.** The complaint does not make clear why plaintiffs cannot use out-of-state facilities and transfer stations other than the three Wheelabrator waste-to-energy plants. *See Sal Tinnerello & Sons, Inc. v. Town of Stonington,* 141 F.3d 46, 49 (2d Cir.1998) (discussing deposits of Connecticut waste at transfer stations in Rhode Island); Legislative Report Appendix A (noting migration of some Connecticut waste "to out-of-state landfills").

States and exceed the inherent limits of the State's power."

*Id.* at 643, 102 S.Ct. 2629 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

This case does not involve a direct assertion of the legislative power of the State of Connecticut to regulate conduct outside of its borders. Instead, it involves an agreement by Wheelabrator to refuse plaintiffs' delivery of waste at its New York and Massachusetts facilities. While the agreement affects the conduct of the Wheelabrator defendants outside of Connecticut, it is the antithesis of "direct" regulation of the kind that is *per se* invalid. Indeed, the analogy the Supreme Court drew in *Edgar* to the territorial limits on the jurisdiction of state courts is equally apposite here.

Although the State of Connecticut is without power to directly legislate restrictions on Wheelabrator's freedom to conduct business in New York and Massachusetts, the Commerce Clause does not act as an inflexible bar against Wheelabrator's agreement to place certain restrictions on its activities there. Of course, the fact that Wheelabrator and CRRA have entered into an agreement does not necessarily insulate it from scrutiny under the Commerce Clause. *See South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 97 n. 10, 99, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). While we discuss this scrutiny in the context of the market participant doctrine, here it suffices to say that such analysis would not require the *per se* invalidation of the settlement agreement that plaintiffs seek.

### 2. Status of CRRA as a Market Participant

■ This brings us to the complete defense CRRA asserts against plaintiffs' Commerce Clause claim. Specifically, CRRA argues that because the settlement agreement was negotiated by two market participants, any undue burden the agreement imposes on interstate commerce does not implicate the Commerce Clause. Under the market participant doctrine, which distinguishes between the direct exercise of a State's sovereign powers and a State's actions in the more general capacity of a market participant, only the former actions are subject to the limitations of the dormant Commerce Clause. *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988). Thus, for example, when a State chooses to manufacture and sell cement, its business methods, including those that favor its residents, are of no greater constitutional concern than those of a private business. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 438–439, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980).

■ The long-term waste disposal contracts that CRRA has negotiated with Connecticut municipalities as a vendor of waste disposal services are clearly market participation. *See USA Recycling*, 66 F.3d at 1272; *SSC Corp. v. Town of Smithtown*, 66 F.3d 502 (2d Cir.1995), *cert. denied*, 516 U.S. 1112, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996). The CRRA–Wheelabrator agreement to protect these contracts from interference by plaintiffs similarly involves the conduct of market participants, rather than the kind of regulatory power exercised by the State as a sovereign. Indeed, plaintiffs argue that CRRA "is without regulatory powers." Brief of Plaintiffs–Appellants at 10.

Moreover, the Commissioner of Environmental Protection, who had the power to decline to permit the Lisbon facility, did not condition his permit decision on Wheelabrator's consent to the terms of the settlement agreement. Rather, the settlement agreement arose out of a judicial proceeding in which CRRA was authorized to participate in order to ensure that the judgment of the Commissioner was exercised in a manner consistent with Conn.Gen.Stat. § 22a–208d(a). *See Connecticut Resources Recovery Authority v. Commissioner of the Department of Environmental Protection*, 1994 WL 60061. The exercise of CRRA's right to obtain judicial review of the Commissioner's determination does not render the subsequent settlement agreement a regulatory act of the State of Connecticut. Nor do plaintiffs argue to the contrary.

■ Instead, plaintiffs' only challenge to the market participant defense is that the settlement agreement affects conduct in "the

trash hauling market," in which CRRA "is not a participant." Brief of Plaintiffs–Appellants at 42. This artificial dissection of the municipal waste processing market is inconsistent with plaintiffs' claim of "antitrust injury" essential to their standing to press their antitrust cause of action. "The requirement that the alleged injury [to plaintiff] be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors." *Bhan v. NME Hospitals, Inc.*, 772 F.2d 1467, 1470 (9th Cir.1985); *see Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which trade was restrained").

This consideration aside, *South–Central Timber Development, Inc. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984), upon which plaintiffs rely, does not avail the plaintiffs here. That case involved a state program of selling timber from state-owned forests at a significantly reduced price on the condition that buyers agree to process that timber at in-state facilities prior to export. The Supreme Court held that "although the State may [have been] a participant in the timber market, it [was] using its leverage in that market to exert a regulatory effect in the processing market, in which it [was] not a participant." *Id.* at 98, 104 S.Ct. 2237. The Court observed that a private seller of goods would have had no proprietary interest in what the buyer later did with those goods when the seller was not a participant in the downstream market. *See id.* at 96, 104 S.Ct. 2237. Because the State retained no proprietary interest in the timber after the point of sale, it could not be considered a market participant in the downstream processing market. *Id.*

██ In contrast, here "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *Carbone*, 511 U.S. at 391, 114 S.Ct. 1677. CRRA is in that business, and it is absurd to suggest that it does not have an interest in obtaining the waste generated by municipalities who have contracted with CRRA to process and dispose of their waste. Moreover, the fact that the settlement agreement protects the integrity of CRRA's municipal contracts by indirectly thwarting the efforts of waste haulers, who were not parties to either the municipal contracts or the agreement itself, does not render it "regulatory" within the meaning of the Commerce Clause. When it acts as a market participant, a state agency may "impose restrictions that reach beyond the immediate parties with which the government transacts business." *White v. Massachusetts Council of Construction Employers*, 460 U.S. 204, 211 n. 7, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). Indeed, the Supreme Court has held that "the Commerce Clause does not require the [State] to stop at the boundary of formal privity of contract." *Id.*

██ Only if the actions of a State, "whether by statute, regulation, or contract," have a "substantial regulatory effect outside of th[e] particular market" in which the State is a participant, do they offend the dormant Commerce Clause. *South–Central Timber*, 467 U.S. at 97, 104 S.Ct. 2237. This case does not cross that line. The waste haulers here are essential participants in the waste processing and disposal market; they pick up waste from municipalities who are contractually obligated to have it delivered to CRRA for disposal. The settlement agreement's impact on plaintiffs is simply a necessary consequence of CRRA's right to contractually procure a supply of municipal waste.

## C. The Alleged Inconsistency Between the Antitrust and Commerce Clause Defenses

██ Plaintiffs' final argument is that CRRA cannot claim both the market participant exception from the Commerce Clause and state action immunity from the antitrust laws. Such a dual exception, plaintiffs argue, "would unfairly permit CRRA to compete as a private party without being subject to antitrust liability like private parties." Brief of Plaintiffs–Appellants at 46. In *SSC Corp.*, 66 F.3d at 517–18, we expressly rejected the argument that, if the challenged contractual agreement entered into by the Town of

Smithtown constituted market participation, rather than regulation, the Town could not avail itself of the state action immunity from the Sherman Act. Nevertheless, plaintiffs argue that we did so without "directly address[ing] the potential conflict between the market participant exception to the dormant commerce clause, on the one hand, and state action immunity to antitrust laws, on the other." Brief of Plaintiffs–Appellants at 48 n. 13.

We see no reason to question the soundness of our holding in *SSC Corp.*, nor do we perceive "a potential conflict" between the *Parker* and market participant doctrines that would automatically render a market participant a regulator of interstate commerce, even though it lacked any regulatory power, if it invoked the *Parker* exemption from antitrust scrutiny. The unfairness plaintiff perceives derives from giving undue weight to one of the policies underlying the market participant doctrine. In *Reeves v. Stake*, 447 U.S. at 439, 100 S.Ct. 2271, the Supreme Court suggested that because "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants[,] ... [e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." Plaintiffs argue that, because CRRA has invoked the *Parker* immunity doctrine, which shields CRRA from the antitrust laws "imposed on private market participants," CRRA may not invoke the principle of "evenhandedness" elucidated in *Reeves*.

Were evenhandedness the only rationale supporting the market participant doctrine, plaintiffs' argument might have some merit. The *Reeves* Court, however, identified several policy considerations underlying the market participant doctrine that largely mirror those underlying the *Parker* immunity doctrine. The most important of these rationales is that of "state sovereignty, [and] the role of each State 'as guardian and trustee for its people.' " *Reeves*, 447 U.S. at 438, 100 S.Ct. 2271 (citations and footnotes omitted). The Supreme Court observed that an "ad hoc" inquiry into the burden on inter-state commerce caused by a state's marketplace activities "would unduly interfere with state proprietary functions if not bring them to a standstill." *Id.* at 438 n. 10, 100 S.Ct. 2271 (quoting *American Yearbook Co. v. Askew*, 339 F.Supp. 719, 725 (M.D.Fla.1972)). Indeed, the Court noted that, even where the State's actions in the marketplace did not involve "integral operations in areas of traditional governmental functions," the State still "may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal." *Id.* The *Reeves* Court concluded that because "the competing considerations in cases involving state proprietary action often will be subtle, complex, politically charged, and difficult to assess under traditional Commerce Clause analysis[,] ... the adjustment of interests in this context is a task better suited for Congress." *Id.* at 439, 100 S.Ct. 2271.

Thus, like the *Parker* doctrine, the market participant doctrine reflects at its core a respect for state sovereignty. *See Parker*, 317 U.S. at 350–51, 63 S.Ct. 307. Indeed, after rejecting the Sherman Act claim in *Parker*, the Supreme Court rejected a Commerce Clause challenge, citing almost identical federalism concerns. *Id.* at 362–63, 63 S.Ct. 307. As Chief Justice Stone wrote in *Parker*:

> When Congress has not exerted its power under the Commerce Clause, and state regulation of matters of local concern is so related to interstate commerce that it also operates as a regulation of that commerce, the reconciliation of the power thus granted with that reserved to the state is to be attained by the accommodation of the competing demands of the state and national interests involved.

*Id.* at 362, 63 S.Ct. 307. While *Parker* did not involve the market participant exception, it is clear that this doctrine is one example of the means by which the Supreme Court has accommodated the federalism concerns articulated in *Parker*.

This accommodation would be undermined by a rule that would automatically prevent its beneficiaries from availing themselves of the

*Parker* doctrine exemption from the Sherman Act. The only support for plaintiffs' argument is a passing suggestion of a "possible market participant exception" to the *Parker* immunity doctrine. *Omni Outdoor Advertising,* 499 U.S. at 379, 111 S.Ct. 1344 ("We reiterate that, with the possible market participant exception, any action that qualifies as state action *is ipso facto* ... exempt from the operation of the antitrust laws.") (punctuation and citation omitted). "Whether such an exception in fact existed and what its scope would be, the Court did not say." 1 P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 224, at 443 (1997).

More significantly, it is difficult to reconcile such an exception to the *Parker* doctrine with *City of Lafayette,* in which eight Justices favored at least a qualified exemption from the antitrust laws for a municipal market participant. Indeed, in *Paragould Cablevision v. City of Paragould,* 930 F.2d 1310 (8th Cir.1991), *cert. denied,* 502 U.S. 963, 112 S.Ct. 430, 116 L.Ed.2d 450 (1992), the Court of Appeals for the Eighth Circuit declined an invitation to create the market participant exception to the *Parker* doctrine that the *Omni* Court suggested was "possible." Specifically, the Court of Appeals held that "the market participant exception is merely a suggestion and is not a rule of law." *Id.* at 1313. "Until such a transformation occurs," it would continue to apply the *City of Lafayette* standard for determining whether a municipal market participant was exempt from the Sherman Act. *Id.* We, too, see no reason to depart from our prior rejection of the same claim raised by plaintiffs here. *SSC. Corp.,* 66 F.3d at 517–18. *See also Four T's, Inc. v. Little Rock Municipal Airport Comm'n,* 108 F.3d 909 (8th Cir.1997); *Limeco v. Division of Lime,* 778 F.2d at 1087; *James Emory, Inc. v. Twiggs County,* 883 F.Supp. 1546, 1562 (M.D.Ga.1995); *Lefrancois v. Rhode Island,* 669 F.Supp. 1204, 1212 (D.R.I.1987); *Transport Limousine of Long Island, Inc. v. Port Authority of New York and New Jersey,* 571 F.Supp. 576, 588 (E.D.N.Y.1983).

## Conclusion

Over a quarter of a century ago, Connecticut developed a scheme for disposing of trash in a way that the private market was then unwilling or unable to undertake. Because we see no merit to plaintiffs' Sherman Act and Commerce Clause challenges to the exceedingly limited steps taken by CRRA to preserve its lawfully acquired contracts from interference, we affirm the order of the district court dismissing the complaint.

